**Jane DOE, Plaintiff,**

v.

**FIRST NATIONAL BANK OF CHICAGO, Defendant.**

No. 85 C 3742.

United States District Court, N.D. Illinois, E.D.

June 30, 1987.

David Mattenson, Stuart Gordon, William J. Arendt, Kanter and Mattenson, Ltd., Chicago, Ill., for plaintiff.

Peter J. Kilchenmann, Lynn A. Goldstein, Linda S. Ruel, Kathleen Conlon, Chicago, Ill., for defendant.

## MEMORANDUM OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

PARSONS, Senior District Judge:

### INTRODUCTION

Jane Doe brought suit under Title VII, 42 U.S.C. § 2000e *et seq.* against her former employer, the First National Bank of Chicago. She alleged that one of her supervisors, Mary Roe, was the prime mover in bringing about her discharge, and that she, Jane, was discharged because she procured an abortion and Mary was horrified about her having it. Following the filing of this suit, some of the individuals involved in it purportedly became targets of threats and harassment. The plaintiff alleged that she had received threatening telephone calls. As a precaution, I entered an order shielding the identities of three of these individuals. The plaintiff's name was substituted with "Jane Doe," and the names of two of her supervisors were substituted with the names "Mary Roe" and "Richard Roe." Their true identities may be disclosed only by further order.

In a separate count in her complaint, Jane Doe originally alleged that her discharge violated an employment contract. This count was dismissed by my order dated October 10, 1986. That order in turn was reconsidered and confirmed by an order dated March 16, 1987. The trial of this case on the issue of liability began on March 23, 1987. The court's findings of fact and conclusions of law will follow within the context of this memorandum. However, because this case involves a question of apparent first impression, I will begin with a brief discussion of whether or not Title VII prohibits adverse employment-related actions taken against an individual because she has had an abortion.

The parties have not cited and independent research has not disclosed any case answering this issue. We must look instead to the language of the statute and to its legislative history. The relevant statu-

tory language, 42 U.S.C. § 2000e–2(a)(1), makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual ... because of such individual's race, color, religion, sex, or national origin...." The pertinent provision, 42 U.S.C. § 2000e(k), added by the Pregnancy Discrimination Act of 1978, Pub.L. 95–555, 92 Stat. 2076 (the Act), provides that the "terms 'because of sex' or 'on the basis of sex' include, but are not limited to, 'because of' or 'on the basis of' pregnancy, childbirth, or related medical conditions...."

Of the characteristics listed in § 2000e–2(a) (race, color, religion, sex, or national origin), four of the five are immutable characteristics of status. The one which is not, religion, is an individual preference. It nevertheless finds protection, presumably because in our constitutional history every individual's "faith" independently has been accorded a fundamental respect. Under the first and fourteenth amendments, states may not prohibit the free exercise of religion. Under Title VII, private employers generally must make reasonable acommodations for religious practices.

■ Subsection k of 42 U.S.C. § 2000e does not expressly provide that an employer who bases an employment-related decision on an individual's choice to procure an abortion is engaging in sex discrimination. Such a reading, however, is a conceivable interpretation of that subsection, because the act of a woman in undergoing an abortion is "affected by pregnancy ... or related medical conditions." This view finds support in the legislative history of, as well as in the guidelines issued by the EEOC in relation to the Act. In the legislative history accompanying the Act, it is stated that "no employer may, for example, fire or refuse to hire a woman simply because she has exercised her right to have an abortion." H.R.Conf.Rep. No. 95–1786, 95th Cong., 2d Sess. 4, reprinted in 1978 U.S. Code Cong. & Admin.News 4765, 4766. Consistent with this legislative history, the EEOC has taken the position that an employer may not discharge, refuse to hire or otherwise discriminate against a woman because she has had an abortion. See Appendix, 29 C.F.R. 1604 (1986). The EEOC's interpretation is entitled to great deference. Griggs v. Duke Power, 401 U.S. 424, 433–34, 91 S.Ct. 849, 854–55, 28 L.Ed.2d 158 (1971).

Although a woman's moral right to have an abortion remains today a matter of profound disagreement, her having a constitutional right to have one was at least recognized by the Supreme Court in Roe v. Wade, 410 U.S. 113, 164, 93 S.Ct. 705, 732, 35 L.Ed.2d 147 (1973). There apparently is no conflict assumed between Congress's choice to protect an individual's free exercise of religion from adverse employment consequences through Title VII and its apparent desire, as seen in the Act's legislative history, to protect an individual's choice to procure an abortion. Presumably, each is a matter of individual choice, and the right to make such choices is a protected one.

In view of the legislative history and the EEOC's interpretation of the Act, I have proceeded with this case on the assumption that Title VII protects from adverse employment consequences an individual's decision to procure an abortion. Of course, assuming that an employee has had an abortion and later was discharged, this standing alone would be insufficient as a foundation upon which to base liability. The important question brought into focus by this observation is how such a case is to be established.

The traditional analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and its progeny, as they concern the "prima facie case," the allocation of burdens and the order of presentation of proof, does not read easily upon the instant situation. It must be noted, however, that the teaching of these cases is that the burden shifting mechanism must operate with some degree of flexibility. See Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253–54 n. 6, 101 S.Ct. 1089, 1094 n. 6, 67 L.Ed.2d 207 (1981). A prima facie case "raises an inference of discrimination only because we presume these acts, if other-

wise unexplained, are more likely than not based on the consideration of impermissible factors. And we are willing to presume this largely because we know from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons, especialy in a business setting." *Furnco Construction Co. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949–50, 57 L.Ed.2d 957 (1978) (citation omitted). This, of course, speaks to the fairness of the mechanism. The fairness of such a presumption here is itself not difficult to accept: whether or not it is fair to presume that, absent some other reason given, a woman who is fired afer having had an abortion was more likely than not fired for that reason. Assuming such a presumption is well-grounded in general experience, then adopting it as being sufficient to entitle a plaintiff to a favorable judgment, in the face of an employer's silence, would be consistent with the purpose of the "prima facie case" as it was explained in *Furnco.*

The point this court seeks to make is that the formula "a woman has had an abortion and subsequently is fired," by itself, with nothing more, logically would be insufficient to state a "prima facie case." Awareness of the general current attitudes of the "American" public makes it difficult to presume that such dismissal more likely than not ensued because of the abortion. Something more ought to be alleged and establish by the plaintiff to earn the benefits of a prima facie status in a Title VII case. In a case such as this, a prima facie standing should require of plaintiff's charge and evidence not only that the employee (1) was meeting her employer's legitimate job-performance expectations, (2) had an abortion, and (3) was terminated; but further that (4) the person or persons responsible for her termination possessed animus toward abortions and (5) knew of hers. The reasonableness of the first requirement, that the employee was meeting her employer's legitimate expectations, is well-established in Title VII and ADEA discharge law. *See, e.g., La Montagne v. American Convenience Products, Inc.,* 750 F.2d 1405, 1409 (7th Cir.1984). Similarly, the second and

third requirements need no special explanation. The fourth and fifth requirements I have just set out, evidence of animus and knowledge of the abortion, necessarily must distinguish this type of case from other Title VII cases. Unlike race, national origin, color, and the usual types of sex discrimination, it is unreasonable and offensive to an awareness of the facts of life to assume, with nothing more, that more likely than not employers easily possess animus towards abortions and that the fact that an abortion was had or was being planned would easily become known. Dislike for abortions is unlike other types of disffections based on immutable traditions regarding class, status and stereotypes. In addition, abortions are not accompanied by readily apparent group identification. The morality versus the immorality issue about abortions is like a personal philosophy that is directed for or against the particular aborting woman herself, and not against some group or class or segment of the population with which her conduct causes her to be identified. This is what distinguishes this type of case from other Title VII cases, and it is because of this distinction that it becomes important, and I so find, that it is necessary that a Title VII plaintiff in an abortion case, before shifting any burden to the defendant employer, allege and show that his conduct toward her would have been different but for his animus toward the having of abortions, and his having come into possession of the knowledge that his employee had one. And of course, an individual's race, color, sex, or national origin are matters about which employers generally are readily aware, as is, for example, pregnancy. The fact that an individual has had or is planning an abortion generally does not become a matter of common knowledge within the workplace. This fact alone may be responsible for the absence of reported decisions on the question raised in this case. Because the incident of abortion is not extrinsically apparent, the employer must have acquired knowledge of it through some form of communicated disclosure.

■ It is with an awareness of and an adherence to the sensibleness of these things that I examine the evidence in this case in terms of the respective burdens of proof in the trial of the case. The remaining factors in the usual Title VII analysis still apply. Once the prima facie case has been established, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the plaintiff's termination, a reason that can resist the defendant's retortive assertion that it is pretextual. Of course, these guidelines never disturb the understructural requirement that the plaintiff always retains the burden of persuasion. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. It is with these things in mind that I proceed into a review of the evidence in this case.

## DISCUSSION OF THE FACTS

According to the evidence admitted in the trial of the case, plaintiff, then a second-year law student, was hired by First National Bank of Chicago (First Chicago) on August 8, 1983. Her position was that of an assistant in the Probate Services Division of the bank. Her supervisor was Richard Roe, and she was assigned to assist Mary Roe, who was a trust officer and probate administrator. Plaintiff worked in this position until she was discharged on January 7, 1985.

There is conflicting testimony about the quality of her work and her general behavior during her employment. Mary Roe testified that she gave plaintiff a verbal warning in September of 1983 concerning plaintiff's taking long lunch periods and her being otherwise absent from her desk for long periods of time. Mary Roe also testified that she frequently criticized plaintiff for inattention to detail in her work. This inattention resulted not only in errors in documents she was expected to produce, but in her issuing of checks on accounts which did not have in them balances sufficient to pay the checks. Richard Roe also testified that on December 21, 1983, he issued a formal verbal warning to plaintiff for her excessive telephone usage.

Plaintiff did not deny these events. She however characterized them as insubstantial and pointed to her documented employment record as proof of efficiency. In January of 1984, for example, shortly after the verbal warning given her by Richard Roe, her work was reviewed and in February she was rated as meeting the requirements of her position. Then she was given a promotion in May of 1984. This increased her grade level and her pay. For this promotion, a complimentary exception was made. Under usual circumstances, she would not have been eligible for promotion until she had worked for a year. However, according to the documents, a review of her prior experience in the areas of trusts and probate, and based upon a strong recommendation given her by Mary Roe under whom she worked, she was considered entitled to and did receive the promotion. Richard Roe testified, however, that this promotion was consistent with an agreement reached between him and plaintiff when she was hired because at that time there was no position available in the grade for which plaintiff then was qualified, and that she was promised such a promotion whenever the higher position should become available.

The documentary evidence tended to establish that throughout the course of much of her employment, Jane Doe met her employer's expectations. Up until near the end of her employment, she was occasionally criticized because of her general work habits and the low level of her attention to the details of her job. Her formal reviews, at the same time, were all complimentary. It was near the end of her employment when her performance deteriorated. According to the record, most of the events which precipitated her discharge occurred in December of 1984. The evidence is that her immediate supervisor, Mary Roe, was scheduled for a short vacation during the latter part of the month continuing until December 27th. She asked Jane Doe to complete five tasks by Deember 27. Jane herself was to take a vacation beginning on December 28th.

According to the testimony of both Jane Doe and Mary Roe, on December 26, 1984,

Jane, while at work, called Mary long distance to Mary's in-law's house in Michigan, and during this conversation Jane informed Mary that she, Jane, was pregnant, was planning to have an abortion, and would need to take off additional time. Jane asked Mary which of the special tasks that had been assigned to her were necessary for her to complete, and Mary told Jane that each of them was important. Beyond that, there is little agreement about the rest of the conversation.

Jane testified that Mary, upon being informed that she, Jane, planned on having an abortion, advised her not to do it, stating that it was "murder" and that she, Jane, would regret having done it. Mary, on the other hand, testified that after Jane said she was pregnant and planned to have an abortion, she offered her comfort and support and promised, at Jane's request, not to mention it to anybody else at the bank.

When Mary returned from her vacation, none of the five matters assigned to Jane had been properly completed. Mary's testimony was that she "snapped," became increasingly angry about what she considered to have been a serious dereliction by Jane of her responsibilities not only during the last several days but over the course of the last several weeks, and decided that "she had had enough." She informed Richard Roe of the situation, and together they agreed that Jane should be issued a final written warning. They prepared the materials documenting the events of the last few weeks, and took the materials to the personnel department. That department reviewed the materials and it was concluded that Jane's employment should be terminated.

There was evidence that Jane's boyfriend, who it appeared participated in the events leading to her pregnancy, called Mary Roe on Friday, January 4th, and told her that Jane would not be coming to work because she was going to have an abortion that day. When Jane returned to work on January 7th, she was told that she was suspended pending termination proceedings. She was read a list of the infractions

that formed the basis of the decision, and according to some of the testimony she responded that she had made some of the mistakes, that some of them were not her fault, and that the real cause if any for her being terminated was that the people in her department were jealous of her legal education and that her supervisors feared that she would eventually "have their jobs." She cleared her desk, and left. Her supervisors began to prepare a termination memorandum, one draft of which was completed on January 7th. The credibility of contents of this memorandum is questioned because of variances in the dates and contents of the copies of the document.

The next day, the bank received a letter from Jane Doe's attorney, demanding that she be reinstated and alleging that the termination was on account of Jane's having had an abortion and also on account of interoffice competition and jealousy. Following this threat of legal recrimination, those at the bank responsible for Jane's termination apparently reworked their termination memorandum, bolstering their reasons for terminating her. The revised draft, as did the original, mentioned incidents beyond the incompletion of the five tasks assigned by Mary to Jane in December. These included overdrafts, incorrect additions, wrong statements in letters, and the warnings given to Jane back in the earlier months of her empoyment.

█ It is important to decide which of the two versions presented concerning the telephone call by Jane to Mary on December 26, 1984, is more likely the correct one. The parties on both sides offered support for their respective versions, some of it by testimony, some by arguing inferences. Jane testified that after she talked to Mary and was told that abortion was murder, she immediately called her boyfriend and told him what she had just been told by Mary. Jane's boyfriend testified as a witness for her, and his testimony sought to confirm hers. Even assuming the admissibility of his testimony about this conversation, I find it difficult to accept. First, as the defendant argues, if this conversation had taken place, it is highly unlikely that Jane's

boyfriend would have called Mary on January 4 to re-inform her, "a rabid anti-abortionist," that Jane indeed was planning to go through with having an abortion. Second, the demeanor of her boyfriend as a witness did not evoke a strong feeling of veracity, and the possible motives for offering it on behalf of a woman whom after she became pregnant he refused to marry, require that it be viewed with serious skepticism. I am impressed that *if* the conversation between Mary and Jane was as Jane described it, it is highly unlikely that Jane would have had her boyfriend call Mary on January 4th to update for her and inform her again about what had caused wrath when first it had been mentioned.

Jane offered other evidence in support of the truth of her version of what happened. First, she testified that Mary had expressed anti-abortion sentiments in the course of a discussion at work before this episode. Mary denied this. This assertion by Jane serves only to undercut further the version of the conversation she offered, since it is unlikely that Jane, knowing beforehand of Mary's opposition to abortion, would later call her when arranging time off and tell her that the reason she wanted the additional time was that she was planning to have one. Jane offered further as support for her assertion that Mary was opposed to abortions that Mary is Catholic and that while attending Saint Mary's College near Notre Dame, Mary enrolled in a class called "Sex and Marriage." Without more, I cannot accept as fact the suggestion that because Mary is Catholic, she most likely would be so opposed to abortion she would allow it to cause her to deliberately injure a person she had befriended and one whose mistakes she had on other occasions covered up.

Mary Roe testified that she favors the idea that an individual ought to have freedom to choose whether or not to have an abortion. In support of this, she testified that she, Mary, had joined the National Organization of Women (NOW) in 1984, as a gesture in support of then Vice-Presidential Candidate Geraldine Ferraro, when at that time the pro-life groups were attempting without success to persuade Fer-

raro to take a stand opposing abortion. Her testimony regarding her active NOW membership was verified by the testimony of an officer of the organization.

Other testimony given by Mary Roe adds weight to her assessment of what happened. She testified that until the bank had received the January letter from Jane Doe's attorney, Jane had not suggested as a reason for her termination that she had had an abortion. In addition, according to her testimony, she had kept Jane's confidence concerning the telephone disclosure and nobody else at the bank was aware of it until it was raised in the letter from Jane's attorney. The bank's employee whose duty it was to look into complaints by employees testified that in her telephone conversation with Jane Doe, no mention was made of an abortion incident. The notes of that conversation corroborated her testimony on that point. The other witnesses for the bank unanimously supported Mary's account. The preponderance of the evidence is that those who authorized Jane's termination did so without knowledge of her abortion or without animus toward her because of it. Jane did not dispute the correctnes of the events mentioned in that record. She disagreed with the significance to be attached to them. I find that those with authority in the bank to discharge her made their decision based upon her job performance. In addition, I find by the greater weight of the evidence that the reasons offered by the defendant for Jane Doe's discharge were not pretextual.

The evidence showed that other of defendant's employees made serious mistakes relating to overdrawn accounts and that they ere not terminated, but these employees were not in positions identical to Jane's, and their employment records did not reflect the kind of erratic behavior that characterized Jane's conduct during the period of time leading directly up to her discharge. Jane claimed that some of the reasons offered for her discharge were insignificant and were offered only after the defendant became aware of the threat of litigation. I find the facts to be that Jane

Doe's work performance during her last days before her discharge was so poor that it was in blatant disregard for the best interests of the bank. The reasons given by the defendant substantially support their best exercise of what appears to be good business judgment. I find the evidence to preponderate on the side of the bank in that Jane Doe was not meeting her employer's reasonable and legitimate expectations.

### CONCLUSION

Because Jane Doe would not prevail in a claim that her employer discharged her because she had an abortion, it would be unnecessary in this case to decide whether or not Title VII actually supports a cause of action for adverse employment treatment premised on an employee's election to procure an abortion. Assuming however that it does, plaintiff here has not carried her burden to prove that she was discriminated against because she had an abortion. Plaintiff's complaint passes muster in alleging a prima facie case of discrimination on account of her having an abortion in that she alleged that she had an abortion, that she was meeting her employer's legitimate job-performance expectations, and that the person responsible for her termination possessed animus toward the having of abortions, and that her employer knew of hers. However, plaintiff failed to establish by the greater weight of the evidence that she was meeting her employer's legitimate job-performance expectations, or that at the time of her discharge her employer possessed an animus against the having of abortions, and that her employer knew about hers. For this reason her claim must be denied. Most important in this case is plaintiff's failure to prove that the persons actually responsible for her discharge knew of her abortion and possessed animus toward abortions.

Accordingly, and consistent with the foregoing, judgment on the complaint will be entered in favor of the defendants, the First National Bank of Chicago and Mary Roe, and against the plaintiff, Jane Doe. The defendants will submit, within ten days hereof, for attachment hereto, upon their adoption by the court, suitable Findings of Fact and Conclusions of Law, the same to accord with the findings and legal determinations of this court in this memorandum of opinion. The entry of judgment herein will await the approval and adoption of such findings and conclusions.