Kimberly TURIC, Plaintiff,

v.

**HOLLAND HOSPITALITY, INC., d/b/a Holiday Inn and Conference Center of Holland, Defendant.**

No. 1:93:CV:379.

United States District Court, W.D. Michigan.

Jan. 27, 1994.

William J. Heaphy, Vandeveer, Garzia, PC, Holland, MI, for Kimberly Turic.

James W. Bouwens, Cunningham Dalman, PC, Holland, MI, for Holiday Inn Of Holland.

## OPINION

ENSLEN, District Judge.

The matter before the Court is defendant's motion for summary judgment on all counts of plaintiff's complaint. The present complaint alleges that plaintiff was illegally terminated from her employment with defendant. Plaintiff alleges she was fired because she considered terminating a pregnancy, she was an unwed mother, and on the basis of improper religious considerations. She also alleges that defendant violated her right to privacy, and interfered with contractual relationships.

### Standard

In reviewing a motion for summary judgment pursuant to Rule 56, this Court should only consider the narrow questions of whether there are "genuine issues as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). On a Rule 56 motion, the Court cannot resolve issues of fact, but is empowered to determine only whether there are issues in dispute to be decided in a trial on the merits. *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir.1987); *In re Atlas Concrete Pipe, Inc.*, 668 F.2d 905, 908 (6th Cir. 1982). The crux of the motion is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986); *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1310 (6th Cir.1989).

A motion for summary judgment requires this Court to view " 'inferences to be drawn from the underlying facts . . . in the light most favorable to the party opposing the motion.' " *Matsushita Electric Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962)), *quoted in Historic Preservation Guild v. Burnley*, 896 F.2d 985, 993 (6th Cir.1989). On the other hand, the opponent has the burden to show that a "rational trier of fact [could] find for the non-moving party [or] that there is a *'genuine issue for trial.'* " *Historic Preservation*, 896 F.2d at 993 (quoting *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356).

As the Sixth Circuit has recognized and consistently emphasized, recent Supreme Court decisions encourage the granting of summary judgments where there are no material facts in dispute. *Historic Preservation*, 896 F.2d at 993 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The courts have noted that the summary judgment motion may be an "appropriate avenue for the 'just, speedy and inexpensive determination' of a matter." *Cloverdale Equipment Co. v. Simon Aerials, Inc.*, 869 F.2d 934, 937 (6th Cir.1989) (quoting *Celotex*, 477 U.S. at 327, 106 S.Ct. at 2554).

### Facts

Plaintiff Kimberly Turic was hired as a busser at defendant Holiday Inn on August 5, 1991. According to plaintiff, on September 23, 1992, plaintiff informed the Holiday Inn Restaurant Manager, Karen Mouw, that she was pregnant. Turic Dep. (appended to plaintiff's response) at 24. Plaintiff asserts that the next day, September 24, 1992, Ms. Mouw's assistant and plaintiff's immediate supervisor, Lecia Hatley, confronted plaintiff. Plaintiff asked Ms. Hatley if she knew plaintiff was pregnant, and Hatley's response was that if she were plaintiff's mother she would slap her. *Id.* An hour later, at the restaurant's hostess section, Ms. Hatley asked plaintiff what she was planning to do about the pregnancy, and if she had thought about abortion or adoption. Plaintiff responded that she would not consider adoption, but she had not ruled out abortion. *Id.*

The parties dispute the course of events that occurred the week of September 25th. Defendant's brief in support of its motion for summary judgment asserts that plaintiff "let it be known around work" she was pregnant,

and that she had not ruled out the possibility of obtaining an abortion. However, the deposition testimony defendant cites does not support the quoted phrase, and it is not assigned dates. Plaintiff asserts that others spread the news. This assertion is supported by the Affidavit of waitress Marcia DeJonge, which explicitly states that she learned of plaintiff's pregnancy directly from plaintiff, but she learned plaintiff was considering an abortion from others. Defendant's Ex. 6 at ¶ 6–7.[1]

Regardless of the source, it is undisputed that 10–15 staff members knew that plaintiff had not ruled out the possibility of exercising her legal right to terminate her pregnancy, and there was a great deal of discussion about this among the staff. According to Mike Karas, defendant's Food and Beverage Director,

> we have a very Christian staff in that restaurant that were very offended by what was being discussed by Kim, and we felt that we needed to—instead of getting them in an uproar—and they were at the point they were going to see their priests—that we needed to talk with Kim.

Defendant's Ex. C at 11–12.

This staff turmoil led to a meeting between Lecia Hatley, Karen Mouw, and plaintiff, which occurred two days after plaintiff informed Ms. Mouw of her pregnancy. Both Hatley and Mouw assert that in addition to the abortion issue, job performance was discussed at the September 25th meeting. The second topic is not reflected in the summary of the meeting. Plaintiff's employee file contains a handwritten note written on a "summary of communication" form, signed by Karen Mouw, and dated September 25, 1992. It states that plaintiff was

> [d]iscipline[d] for making uproar of staff. Told not to talk about personal decision to terminate pregnancy. Informed if speaking of it again will result in termination.

Defendant's Ex. 9, p. 1. No staff members were told not to discuss the issue of plaintiff's consideration of abortion, or disciplined for doing so. Karas Dep. at 23.

Plaintiff asserts that the only person with whom she discussed the issue after this warning was hostess Andrea Johnson. Plaintiff states that she told Ms. Johnson at a party[2] that she did not want to speak about it and that she did not want anything said at work. Turic Dep. at 35, 40.[3]

Seven days after her meeting with Mouw and Hatley, plaintiff was fired. The second column on the page which contains notes of the September 25 meeting is dated October 2, 1992, and is also signed by Karen Mouw. It states:

> Termination on basis of poor job performance and insubordination. Kim admitted that she knew she would be terminated if she spoke of the issues discussed on Sept. 25. Lecia Hatley present. Ran out to car and left. Basis of controversy on a daily basis in dining room.

Defendant's Ex. 9, p. 1.

Defendant asserts that "poor job performance" refers to the fact that, on January 27, 1992, plaintiff received a "written warning notice" for her failure to call in sick. Defendant's Ex. 3. Defendant also alleges that plaintiff committed other rule infractions, such as failing to fill coffee pitchers, clear trays from the hallway, being tardy, and "talking back," for which she was verbally reprimanded. These alleged incidents are not documented in plaintiff's employee file.[4] Plaintiff disputes these characterizations.

Page 3 of Exhibit 9 contains another statement signed by Karen Mouw. It appears to

---

1. In his deposition, Mike Karas identifies Ms. DeJonge as one of two employees who complained because they were very offended by the discussion of abortion. Defendant's Ex. C at 11, 13.

2. Plaintiff's testimony does not indicate whether the party was on or off work premises.

3. The Affidavit of Andrea Johnson, a Holiday Inn restaurant hostess, indicates that plaintiff "con-tinued to speak" with affiant and others at work about her consideration of abortion after September 25, 1992. Defendant's Ex. 8 at ¶ 6.

4. Defendant's employee guide calls for written warnings for the first two unexcused tardinesses in a year, a written warning plus suspension for the third, and termination for the fourth. A similar procedure is outlined for absences. Plaintiff's Ex. G at 17–18.

be written on a piece of notebook paper. Interestingly, it is not dated, and it does not mention the abortion question. Instead, it asserts that plaintiff was

> [t]erminated on basis of poor unsatisfactory job performance. Specifics: Constantly running out of coffee at front desk, Trays in halls. Written warning on 1–26–92 6:00 am did not follow policy for calling in sick this affected guest satisfaction and performance of co-workers.

This statement seems to contradict Ms. Mouw's deposition testimony, which suggests that the failure to call in sick did not play a significant role in her decision to terminate plaintiff.[5] A "personnel action form" dated October 7, 1992, and signed by Mouw and Karas gives "poor job performance" and "insubordination" as the reason for separation. Plaintiff's Ex. D.

### Pregnancy Discrimination

After drawing all inferences from the underlying facts in the light most favorable to plaintiff, I conclude that plaintiff has established a genuine dispute of material fact on the question of whether she was fired because she was considering terminating her pregnancy.

■ If, but for plaintiff's consideration of abortion, she would not have been fired, defendant has violated the law. In pertinent part, 42 U.S.C. § 2000e–2 states that it is an unlawful employment practice for any employer to "discharge any individual, or otherwise to discriminate against any individual ... because of such individual's ... sex." The Pregnancy Discrimination Act of 1978 ("PDA"), 42 U.S.C. § 2000e(k), explains that

> the terms "because of sex" or "on the basis of sex" include, but are not limited to, "because of" or "on the basis of" pregnancy, childbirth, or related medical conditions....

I interpret the PDA's use of the term "related medical conditions" to encompass a woman's constitutional right to have an abortion.

■ This interpretation is supported by the Equal Employment Opportunity Commission ("EEOC") Guidelines on the issue, which are entitled to great deference. *Griggs v. Duke Power,* 401 U.S. 424, 433–34, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971). These Guidelines state:

> The basic principle of the [PDA] is that women affected by pregnancy and related conditions must be treated the same as other applicants and employees on the basis of their ability or inability to work. A woman is therefore protected against such practices as being fired.. merely because she is pregnant or has had an abortion.

Appendix 29 C.F.R. 1604 (1986). This Guideline is consistent with the Act's legislative history, which explains that:

> Because the conference substitute applies to all situations in which women are "affected by pregnancy, childbirth, and related medical conditions," its basic language covers women who chose to terminate their pregnancies. Thus, no employer may, for example, fire or refuse to hire a woman simply because she has exercised her right to have an abortion.

H.R.Conf.Rep. No. 95–1786, 95th Cong., 2d Sess. 4, *reprinted in* 1978 U.S.Code Cong. & Admin.News 4765–66. *See also,* H.R. No. 948, 95th Cong. 2, *reprinted in* 1978 U.S.Code Cong. & Admin.News, 4749–50 (Congress' intent in enacting the PDA was to codify EEOC guidelines that required employers to "treat disabilities caused or contributed by pregnancy, miscarriage, abortion, childbirth and recovery therefrom as all other temporary disabilities.")

The only other reported cases which explicitly address whether the PDA protects women from being fired because they have had an abortion hold that it does. *Doe v.*

---

**5.** The following exchange is recorded on page 48 of Ms. Mouw's deposition:

Q: Was that failure to abide with the call-in policy a ground for—or one of the reasons relied upon by you in firing Kim Turic?
A: Did that influence my decision?
Q: Yes.
A: I'm sure it did.
Q: Well, you're the person who made that decision. So I want to know, yes or no, did it or didn't it?
A: Probably not that one instance, the one calling in sick. It wasn't my concern.

*First National Bank of Chicago,* 668 F.Supp. 1110 (N.D.Ill.1987), *aff'd* 865 F.2d 864 (7th Cir.1989).

The lack of reported cases on this topic may be a result of the fact that, unlike race, gender and pregnancies carried to term, employers do not know when employees obtain abortions unless they are told. In this case, because she was considering continuing her pregnancy, plaintiff informed her supervisor, Ms. Mouw, that she was pregnant. Plaintiff's immediate supervisor, Ms. Hatley, then asked plaintiff if she planned to carry the pregnancy to term. This question is legitimate in the context of the workplace, because supervisors need to plan ahead for a potentially extended employee absence due to childbirth. In response to this direct question, plaintiff candidly responded that she had not ruled out abortion.

█ The fact that plaintiff was contemplating abortion, and had not had one at the time she was fired, does not preclude this law suit. It is clear that the employee "uproar" was in response to plaintiff's consideration of abortion. Given the rapid response to plaintiff's disclosure (she was warned to not discuss the topic one day after she informed Hatley, and she was fired seven days after that warning), defendant's failure to wait and see what plaintiff would decide[6] should not shield it from liability. For purposes of Title VII analysis, I see no rational distinction between an employee's communication of the fact that she has had an abortion, that she intends to have an abortion, or that she is considering having an abortion. Discharge on the basis of either of these statements violates federal law.

### Disparate Impact Analysis

█ There are two theories plaintiff's sex discrimination claim may proceed under. The first is called "disparate impact." 42 U.S.C. § 2000e–2(k). It does not require proof of a discriminatory motive. Instead, plaintiff must show that defendant's facially neutral policy has a disproportionately adverse impact on the basis of sex. The employer then must prove that the practice is

"job related" and "consistent with business necessity." § 2000e–2(k)(1)(A)(i). If the employer meets its burden of proving business necessity, the Civil Rights Act of 1991 added the provision that plaintiff may rebut with evidence that a less burdensome, alternative practice exists which defendant refuses to adopt. § 2000e–2(k)(1)(A)(ii). The 1991 amendment also provides that, in a "mixed motive" case, an unlawful employment practice is established when plaintiff demonstrates that sex was a motivating factor for her discharge, even though other factors also motivated it. § 2000e–2(m). Defendant has not challenged a disparate impact attack, so by definition it remains open for plaintiff to pursue.

### Disparate Treatment Analysis

The second theory, "disparate treatment," is the claim defendant's motion challenges. 42 U.S.C. § 2000e–2(a)(1).

### 1. Plaintiff's Initial Burden

█ In order to meet her initial burden of proof under a disparate treatment theory, plaintiff must demonstrate:

1. That she belongs to a protected Title VII class;
2. That she is qualified for the position;
3. That despite those qualifications, she was discharged;
4. After her discharge, the position continued to be needed by the employer, and the employer replaced her with a person outside of her Title VII class.

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

Genuine disputes of material fact exist concerning plaintiff's qualifications for her job. Therefore, for purposes of summary judgment, I presume that plaintiff can establish a prima facie disparate treatment case.

### 2. Defendant's Burden of Production

█ The Court's attention next shifts to the defendant. The defendant's burden at this point was recently redefined in *St. Mary's Honor Center v. Hicks,* 509 U.S.

---

6. Plaintiff ultimately decided not to terminate her pregnancy.

——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). *St. Mary's* explains that the employer's burden is simply one of production. It must produce evidence that the adverse employment action was taken for a legitimate, nondiscriminatory reason. *St. Mary's,* 509 U.S. at ——, 113 S.Ct. at 2748, 125 L.Ed.2d at 416.

 In this case, defendant asserts that plaintiff was terminated for two reasons: poor job performance, and because she disobeyed direct orders not to discuss her consideration of abortion.[7] Both of these assertions are disputed factual issues, but I hold that they satisfy defendant's burden of production. This determination involves no credibility assessment. *St. Mary's,* 509 U.S. at ——, 113 S.Ct. at 2748, 125 L.Ed.2d at 417. It is enough that defendant has come forward with evidence that it discharged plaintiff due to poor performance.

### 3. *Plaintiff's Ultimate Burden of Proving Intentional Discrimination*

For purposes of this motion, I am satisfied that the defendant has carried its burden of producing a non-discriminatory rationale for plaintiff's discharge. Therefore,

> the McDonnell Douglas frame work—with its presumptions and burdens—is no longer relevant.... The defendant's 'production' (whatever its persuasive effect) having been made, the trier of fact proceeds to decide the ultimate question: whether plaintiff has proven 'that the defendant intentionally discriminated against [her because of her abortion].'

*St. Mary's,* 509 U.S. at ——, 113 S.Ct. at 2748, 125 L.Ed.2d at 418. At this point I must evaluate whether plaintiff has established a genuine dispute of material fact as to whether defendant's offered reasons are a pretext for intentional discrimination.

Nothing in *St. Mary's* indicates that it is intended to alter the ultimate burden of persuasion the plaintiff carries. Review of the evidence convinces me that there is a genuine dispute of fact over whether plaintiff's

allegedly poor job performance motivated defendant's decision to discharge plaintiff, in whole or in part. However, I also believe that there is a genuine dispute of fact over whether plaintiff's consideration of abortion motivated defendant's decision, in whole or in part.

Therefore, for purposes of summary judgment, I will analyze the dispute as a mixed-motive case, and measure the plaintiff's ultimate burden of persuasion accordingly.

 In a mixed-motive case, a Court must be convinced that the employer would have made the same decision in the absence of discrimination. The employer will not prevail by offering a legitimate and sufficient reason for its decision if that reason did not motivate it at the time of the decision. *Price Waterhouse v. Hopkins,* 490 U.S. 228, 252–53, 109 S.Ct. 1775, 1791–92, 104 L.Ed.2d 268 (1989).

In *Price Waterhouse,* the Court used employees' remarks about the plaintiff as evidence of defendant's mixed motive for denying her partnership: legitimate concerns with her interpersonal relationships with colleagues, and impermissible sex stereotyping. The Court remanded the case to the lower court to determine if defendant would have taken the same action if it had not allowed sex-linked evaluations to play a part in the decisionmaking process. *Id.* at 254–55, 109 S.Ct. at 1792–93.

I find that the evidence plaintiff has presented in response to defendant's summary judgment motion creates a genuine dispute of material fact over (a) whether defendant was motivated by a non-discriminatory motive at the time of discharge, and (b) whether any non-discriminatory motives defendant may have had would have provided a sufficient basis for plaintiff's discharge standing alone. Therefore, defendant's motion for summary judgment on plaintiff's Title VII abortion discrimination claim will be denied.

---

7. For the record, I note that the fact that other employees were upset by plaintiff's consideration of abortion does not provide a "business justification" for sex discrimination, any more than customer or colleague preference provides a justification for race discrimination. *Vigars v. Valley Christian Center,* 805 F.Supp. 802, 808 n. 4 (N.D.Cal.1992).

## Discrimination on the Basis of Plaintiff's Status as an Unwed Mother

 After considering the facts in the light most favorable to plaintiff, I believe that they do not support this claim. Plaintiff was an unwed mother at the time defendant hired her, and there is no claim that defendant was unaware of this fact. Defendant's assertion that it employs eight other unwed mothers is uncontested. Finally, it is clear that the controversy among the staff which ultimately led to plaintiff's discharge surrounded her consideration of abortion, not her consideration of bearing a child out of wedlock.

I do not believe that, standing alone, the assertion that Ms. Hatley told plaintiff that if she were her daughter, Ms. Hatley would slap her, can sustain plaintiff's claim that she was terminated on the basis of her status as a single woman who had one child (and was contemplating a second) out of wedlock. Therefore, defendant is entitled to judgment on the marital status claim as a matter of law.

## Dismissal Based on Improper Religious Considerations

In pertinent part, 42 U.S.C. § 2000e–2 states that it is an unlawful employment practice for any employer to

(1) ... discharge any individual, or otherwise to discriminate against any individual ... because of such individual's ... religion ..., or

(2) to limit, segregate, or classify his employees ... in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's ... religion....

42 U.S.C. § 2000e(j) instructs that:

The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's ... religious observance or practice without undue hardship on the conduct of the employer's business.

The EEOC Guidelines contain the following basic definition of what is meant by a religious practice or belief:

[I]n those cases in which the issue [of whether or not a practice or belief is religious] exist[s], the Commission will define religious practices to include moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views.

29 C.F.R. Part 1605.

 Defendant correctly points out that plaintiff has not alleged that her consideration of abortion was propelled by any religious belief or practice, or that the order not to discuss abortion at work was in conflict with a tenet of her faith. Therefore, this is not the classic religious "accommodation" case.

Instead, plaintiff alleges that she was fired to protect the religious sensibilities of the rest of the staff, and that their religion was impermissibly forced upon her. Plaintiff asserts that, in essence, a religious test was established as a condition of employment with defendant. She argues that because her views on the morality of abortion differed from those of the Christian staff, she was treated differently than they were on the basis of religion. This claim is supported by the fact that, in response to the allegedly disruptive "uproar" over abortion, no staff members were disciplined, except for plaintiff, who was fired.

The Sixth Circuit has permitted such "employment atmosphere" claims of religious discrimination to proceed. In *Blalock v. Metals Trades, Inc.*, 775 F.2d 703 (6th Cir.1985), *aff'd on appeal after remand*, 833 F.2d 1011 (6th Cir.1987), *cert. denied*, 490 U.S. 1064, 109 S.Ct. 2062, 104 L.Ed.2d 627 (1989), the plaintiff eagerly accepted employment with an openly "Christian" company, and received permission to "bear witness" to his clients. However, after plaintiff had a falling out with the spiritual leader of the sect he shared with his employer, he was fired. The fact that plaintiff's religious views came to differ from his employers was a factor in his discharge, and therefore plaintiff stated a viable Title VII claim. *Id.* at 709.

The fact that plaintiff's disagreement on

religious issues with her employer[8] is not premised on a faith of her own does not preclude her suit. If the plaintiff in *Blalock* quit the church altogether, the case's result would have been the same. In addition, as the *Blalock* court explained in dicta:

> during the initial phase of Blalock's tenure at Metals Trades, other employees who did not share [the employer's] religious views were apparently held to a higher standard of performance. Had one of them been discharged for misconduct of a severity comparable to that engaged in by Blalock, he or she would have had a potential claim of religious discrimination.

775 F.2d at 709, n. 5. *See also, EEOC Decision No. 72–1114*, 4 F.E.P. Cases 842 (1972) (supervisor who discussed his religious convictions on the job violated Title VII's requirement of a working environment free from religious intimidation); *Weiss v. United States*, 595 F.Supp. 1050, 1056 (E.D.Va.1984) (religious harassment, like sexual harassment, usually appears in one of two forms: a hostile environment, or *quid pro quo* ).

Ms. Mouw states that the pregnancy of a staff member is a common topic of conversation among her staff. Mouw Dep. at 48. Mr. Karas states that no other topic has ever been forbidden on Holiday Inn premises. Karas Dep. at 22. He further states that his "very Christian staff" was "very upset" by discussions of their colleague's consideration of abortion. *Id.* at 11–12. Therefore, I can only presume that the defendant's use of the word "personal," as in its assertion that plaintiff was simply asked not to discuss "personal decisions" at work, is code for the term "morally offensive to our Christian employees."

According to defendant's version of the facts, both plaintiff and her Christian colleagues engaged in the same conduct—discussion of plaintiff's consideration of abortion. Yet, to use *Blalock's* formulation, plaintiff's complaint alleges that the employee who did not share a certain set of religious beliefs was "held to a higher standard of performance." The employee who believed that abortion was morally permissible was identified as the "cause" of the problem, as opposed to the Christian employees who objected to it, and was eliminated.[9] This allegation of disparate rulemaking and disproportionate punishment along religious lines states a bona fide claim of religious discrimination under Title VII, and plaintiff shall be given an opportunity to prove her allegations at trial.

### Conclusion

For the foregoing reasons, plaintiff's pregnancy discrimination and religious discrimination claims will be retained. Because they were not challenged, this Opinion does not reach her "privacy" and "interference with contract" claims. Plaintiff's marital status discrimination claim will be dismissed.

### PARTIAL JUDGMENT

In accordance with the Opinion entered on this date;

**IT IS HEREBY ORDERED** that defendant's motion for summary judgment (dkt. # 27), dated November 15, 1993, is **GRANTED in part and DENIED in part**. Plaintiff's marital status discrimination claim, located in paragraphs 4 and 5 of her amended complaint, is **DISMISSED**.

---

8. I am aware that there is no direct evidence that the decisionmakers who fired plaintiff shared the staff's "Christian" beliefs about abortion. However, they were acting in response to the staff's "Christian" concerns, and therefore acted as a conduit for the staff's religious approbation of plaintiff.

9. Defendant cites *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1312 (6th Cir. 1989), for the proposition that an employee is not protected by Title VII when she violates legitimate rules and orders of the employer, disrupts the employment environment, or interferes with the attainment of the employer's goals.

This citation is misleading, because the cited passage refers only to the protection of "opposition" activity under the Elliot–Larsen anti-retaliation provisions. Plaintiff does not allege that she refused to obey defendant's order because she had a good faith belief that the order was unlawful; she alleges that she followed the order. For purposes of summary judgment, I accept her assertion. Therefore, the anti-retaliation issue is irrelevant to the present motion.