Kimberly TURIC, Plaintiff,

v.

HOLLAND HOSPITALITY, INC., d/b/a
Holiday Inn and Conference Center
of Holland, Defendant.

No. 1:93:CV:379.

United States District Court,
W.D. Michigan.

March 8, 1994.

**546**

William J. Heaphy, Vandeveer, Garzia, PC, Holland, MI, for plaintiff.

James W. Bouwens, Cunningham Dalman, PC, Holland, MI, Sheila Kinney, Patterson, Kinney & Ruga, Grand Rapids, MI, for defendant.

## OPINION

ENSLEN, District Judge.

On February 14 and 15, 1994, this Court conducted a bench trial on plaintiff's wrongful termination claim. Plaintiff asserts pregnancy discrimination and religious discrimination claims.[1] Defendant argues that plaintiff was fired for poor job performance; specifically, the failure to keep complimentary coffee urns full. Pursuant to Fed.R.Civ.P. 52(e), the Court enters the following Findings of Fact and Conclusions of Law.

### Findings of Fact

### Plaintiff's Course of Employment

Defendant Holland Hospitality, Inc. owns a Holiday Inn hotel in Holland, Michigan. The hotel has 168 rooms, and between 170 to 180 employees. Plaintiff Kimberly Turic was hired as a busser at the Holiday Inn on August 5, 1991. On that date, plaintiff was a seventeen year old single mother of one. Later in her employment, plaintiff became part of defendant's room service staff. Plaintiff was terminated on October 2, 1992.

#### 1. The Abortion Controversy

On or about September 24, 1992, plaintiff informed the restaurant manager, Karen Mouw, that she was pregnant. On September 24, 1992, Ms. Mouw called plaintiff at home and asked her for the name of the doctor who confirmed her pregnancy. The next day, Ms. Mouw called the doctor. Ms. Mouw has supervised many pregnant employees, and has never called the doctor of a pregnant woman before. An entry in Ms. Turic's file states:

> Sept. 25th—Called doctor office to confirm pregnancy to see if any limitations for work. [W]as told she had not been to doctor since Jan 13—She Kim said Dr. Tyler had confirmed pregnancy.

Plaintiff's Ex. 1.

At the time plaintiff told Ms. Mouw of her pregnancy, she had not yet decided whether to carry the pregnancy to term. It is undisputed that before September 25, 1992, two employees and both of plaintiff's supervisors knew this. Plaintiff told her friend and colleague in the restaurant, Andrea Johnson, of her quandary on September 23rd or 24th. In addition, a family friend and waitress named Amy Schippa, approached plaintiff on September 25th and informed her that plaintiff's mother had told Ms. Schippa about plaintiff's situation. Finally, at some point, plaintiff informed either Ms. Mouw, Lecia Hatley (the Dining Room Supervisor and Ms. Mouw's assistant), or both that she would not consider adoption, but she had not ruled out abortion.[2]

Though it is unclear how the rumors began, it is undisputed that the news of plaintiff's consideration of abortion spread like wildfire, until 10–15 members of the restaurant staff were openly discussing it. As defendant's Food and Beverage Director, and assistant to General Manager Herman, testified in deposition, "we have a very Christian staff in that restaurant that were very offended" by the discussions. Karas Dep. at 11–12. Ms. Mouw characterized the discussions as an "uproar." A waitress named Celia Kleinhexel approached Ms. Hatley and said that if the "talk" continued she would have to quit. Ms. Kleinhexel also reported that another waitress, Linda Adams, was so upset "she was seeing her pastor about it."

---

**1.** Plaintiff's marital status discrimination claim was dismissed on summary judgment. *Turic v. Holland Hospitality,* 1994 U.S.Dist. LEXIS 922 (January 27, 1994).

**2.** If plaintiff only told one manager directly, it is clear that this manager shared the information with the other.

Ms. Hatley confirmed with Ms. Adams that this was true.

Ms. Mouw and Ms. Hatley knew that a large number of staff members were discussing Ms. Turic's abortion decision. These supervisors felt that the gossip was disruptive to the work environment, and wanted it to stop. After consulting with Mr. Herman and Mr. Karas, Mr. Herman authorized them to discipline plaintiff. Mr. Herman was left with the impression that plaintiff was "instigating" turmoil in the kitchen, which he defined as being the subject matter of the talk. Mr. Karas believed that plaintiff was properly singled out because she was the subject matter of the discussions, and the staff was so upset it was "ready to walk out."

Ms. Mouw and Ms. Hatley chose to deal with the problem by meeting with plaintiff on September 25, 1992. At that meeting, they told plaintiff not to discuss her consideration of abortion at work, and warned her that if she did so she would be terminated. Plaintiff did not want the staff discussing her personal decision, and she did not want to lose her job, so she quickly agreed not to raise the topic at work. A written warning was entered in plaintiff's personnel file.

Ms. Mouw was aware that the controversy was among the staff, not between the staff and plaintiff. However, no other staff members were ever told not to discuss the issue of plaintiff's consideration of abortion, and none were disciplined for doing so.

### 2. Plaintiff's Job Responsibilities and Performance

It was undisputed that plaintiff had three significant job responsibilities. Her primary responsibility required her to be stationed in the kitchen. There she was to answer the telephone, take room service orders, and then deliver the food to the guests' rooms.

The next two tasks seem to have been of equal importance. Plaintiff was responsible for clearing used room service trays out of the halls. At one point in her employment this was accomplished by periodically walking the halls to check for trays. Later, a system was instituted to record what rooms had trays, so plaintiff could specifically check the hall by that room.

Finally, plaintiff was required to insure that urns of complimentary coffee in the front lobby did not become empty. The front lobby is located one floor directly above the kitchen.

When plaintiff was not busy with these tasks, she was to fold napkins with silverware, bus tables in the restaurant, and generally be available to help the restaurant staff.

It was undisputed that there were times, particularly in the mornings, when the complimentary coffee urns ran dry before plaintiff attended to them. However, the fact that her job required her to attend to her room service duties first, during the breakfast hours, helped to create a situation which made it more likely that this would happen.

The general manager of the Holiday Inn, Mark Herman, arrived at work at approximately 8:00 a.m. each day of the week of September 25, 1992. On three mornings that week, he found that the complimentary coffee urn was empty. On each of these three occasions Mr. Herman brought the urn to the kitchen, and saw plaintiff at her post. Each time, he told her she had run out of coffee, and she offered to take care of it.

The third occasion occurred the day plaintiff was fired, October 2, 1992. When plaintiff saw Mr. Herman with the urn that morning, she said something to the effect of, "I'll get that, I have a minute." Plaintiff testified that Mr. Herman simply looked at her and walked away with the urn. Mr. Herman testified that he said something to the effect of, "Don't worry, I've got it," in a sarcastic tone.

No witness claimed that plaintiff ever failed to fill the urns when she learned they were empty, or disobeyed a direct order to fill them.

### 3. The Termination

On October 2, 1992, plaintiff was summoned to a meeting with Ms. Mouw and Ms. Hatley, and Ms. Mouw informed her that it was "time to part ways." The parties agree that both job performance and abortion were

discussed, but the order of events is in dispute. I find that this dispute is immaterial to the ultimate outcome.

Plaintiff asserts that Ms. Mouw stated that she was being fired because two people reported to Ms. Mouw that plaintiff continued to talk about her abortion decision, and that one waitress needed to see her pastor about it. After plaintiff became upset, they talked about performance, and Ms. Mouw stated that Mr. Herman was upset that he had found the complimentary coffee urn in the lobby empty that morning, and did not understand what plaintiff said to him when she saw him with the empty urn in the kitchen.

According to Ms. Mouw and Ms. Hatley's version of events, plaintiff was told at the beginning of the termination meeting that she was being fired because she failed to keep the complimentary coffee urns full. Plaintiff did not believe this, and said she thought she was being fired because of the abortion controversy. Ms. Mouw responded that although this was not the basis for the termination, she had reason to believe plaintiff had violated her direct order and continued to speak about her abortion decision at work.

All witnesses agree that the plaintiff left the meeting in tears and ran out to the parking lot. Ms. Mouw then told Mr. Karas and Mr. Herman what had happened.

At 2:00 that afternoon, she returned, and asked to speak to Mike Karas, Ms. Mouw's superior. Plaintiff met with Karas and Mouw, expressed her anger, and told them that she believed she was being fired for considering an abortion. They responded that it was a performance issue.

### The Personnel File

With the exception of her termination date, plaintiff's personnel file contains no negative entries regarding her job performance.

Before September 25, 1992, there were two entries of note. First, on January 26, 1992, nine months before she was fired, plaintiff failed to follow the correct procedure for calling in sick. Plaintiff's Ex. 5. This infrac-

tion is summarized on a form titled "Written Warning Notice." Second, a form captioned "Personnel Action Form" documents that effective May 11, 1992, Ms. Turic received a raise. Four months before she was fired, Ms. Mouw, Mr. Karas, and the General Manager[3], signed a statement which gives the following "explanation" for the raise:

> One year of employment. Knows the responsibility of Bussing and Room Service very well. Always willing to help co workers in her department as well as others. Enjoys work very much.

Plaintiff's Ex. 4.

The next entry of consequence is the record of the September 25, 1992, disciplinary meeting Karen Mouw made. A handwritten entry on a form captioned "Summary of Communication" states:

> [d]iscipline[d] for making uproar of staff. Told not to talk about personal decision to terminate pregnancy. Informed if speaking of it again will result in termination.

Plaintiff's Ex. 1.

Plaintiff's October 2, 1992, termination received the following treatment. After the morning meeting at which Mouw and Hatley fired plaintiff, Ms. Mouw made the following entry on the page which holds the September 25, 1992, entry:

> Termination on basis of poor job performance and insubordination. Kim admitted that she knew she would be terminated if she spoke of the issues discussed on Sept. 25. Lecia Hatley present. Ran out to car and left. Basis of controversy on a daily basis in dining room.

*Id.*

The events of October 2nd did not end with the termination meeting and its documentation. The afternoon brought a second meeting, and a second write-up.

When plaintiff returned to the Holiday Inn the afternoon of October 2, she spoke with Mouw and Karas. Ms. Mouw testified that the first termination entry was made between the first and second meetings. How-

---

**3.** Although the signature is illegible, I presume that it is Mark Herman's, because he was the general manager at the time.

ever, at some point after she had already written her first summary of the termination, Mr. Herman directed Ms. Mouw to write what became her second termination record. Ms. Mouw asserted that she "did not know" why she did not tell him that she had already completed the task, and instead did it a second time. Mr. Karas testified that after reading her first termination summary, Mr. Herman asked Ms. Mouw to "expound on it a little bit."

Ms. Mouw's second entry regarding plaintiff's termination is markedly different than the first. This narrative is handwritten on a piece of notebook paper, and it is undated. It states that plaintiff was:

> [t]erminated on basis of poor unsatisfactory job performance. Specifics: Constantly running out of coffee at front desk, Trays in halls. Written warning on 1–26–92 6:00 am did not follow policy for calling in sick this affected guest satisfaction and performance of co-workers.

*Id.*

Although literally half of the second entry is devoted to plaintiff's failure to follow the call in procedure nine months before she was fired, the author of this passage informed the Court that it was not a factor in the termination decision. Ms. Mouw testified that she added it "because it was ... a written warning in her file. And I just threw that in there as any documentation I had."

This impulse may have been expressed on the "Absentee Calendar" as well. The square for September 25, 1992, holds a "7," which the code at the top identifies as "discipline." In the square for October 2, 1992, Ms. Mouw wrote "[d]id not follow proper call in procedure Termination." Again, when confronted with this entry, Ms. Mouw testified that the termination "had nothing to do with proper calling in procedure. I really cannot tell you honestly why that is on there."

Finally, the file contains a "Personnel Action Form" effective October 7, 1992, which details "Poor Job performance. Insubordination." as the reasons for separation. Plaintiff's Ex. 3.

## Conclusions of Law
### Abortion Discrimination

If plaintiff's consideration of abortion motivated defendant's decision to fire her, defendant has violated the law. In pertinent part, 42 U.S.C. § 2000e–2 states that it is an unlawful employment practice for any employer to "discharge any individual, or otherwise to discriminate against any individual ... because of such individual's ... sex." The Pregnancy Discrimination Act of 1978 ("PDA"), 42 U.S.C. § 2000e(k), explains that

> the terms "because of sex" or "on the basis of sex" include, but are not limited to, "because of" or "on the basis of" pregnancy, childbirth, or related medical conditions. . . .

I interpret the PDA's use of the term "related medical conditions" to encompass a woman's constitutional right to have an abortion.

This interpretation is supported by the Equal Employment Opportunity Commission ("EEOC") Guidelines on the issue, which are entitled to great deference. *Griggs v. Duke Power*, 401 U.S. 424, 433–34 (1971). The relevant Guideline states:

> The basic principle of the [PDA] is that women affected by pregnancy and related conditions must be treated the same as other applicants and employees on the basis of their ability or inability to work. A woman is therefore protected against such practices as being fired .. merely because she is pregnant or has had an abortion.

Appendix 29 C.F.R. 1604 (1986). This Guideline is consistent with the Act's legislative history, which explains:

> Because the conference substitute applies to all situations in which women are "affected by pregnancy, childbirth, and related medical conditions," its basic language covers women who chose to terminate their pregnancies. Thus, no employer may, for example, fire or refuse to hire a woman simply because she has exercised her right to have an abortion.

H.R.Conf.Rep. No. 95–1786, 95th Cong., 2d Sess. 4, *reprinted in* 1978 U.S.Code Cong. & Admin.News 4765–66. *See also*, H.R. No. 948, 95th Cong. 2, *reprinted in* 1978 U.S.Code Cong. & Admin.News, 4749–50

(Congress' intent in enacting the PDA was to codify EEOC guidelines that required employers to "treat disabilities caused or contributed by pregnancy, miscarriage, abortion, childbirth and recovery therefrom as all other temporary disabilities.")

The only other reported cases which explicitly address whether the PDA protects women from being fired because they have had an abortion hold that it does. *Doe v. First National Bank of Chicago,* 668 F.Supp. 1110 (N.D.Ill.1987), *aff'd* 865 F.2d 864 (7th Cir.1989).[4]

Abortion discrimination cases may be unique, but they share a critical element with other categories of discriminatory employment practice prohibited by Title VII. Many people have negative reactions to women who have had, or are seeking, abortions. In order to fully protect women's constitutional right to control their reproductive capacity, Congress has insured that private employers cannot penalize them for exercising that right.

At this juncture, it is important to identify why Title VII reaches the factual scenario plaintiff presents. Plaintiff cannot allege that she was fired for having an abortion, because she had not had one at the time she was fired. Instead, on that date, she was contemplating choosing an abortion. In fact, plaintiff chose to carry her pregnancy to term.

These facts do not comprise her claim for redress. It is clear that defendant's actions, and the employee "uproar," were in response to plaintiff's consideration of abortion. It would be perverse to reward an employer's rapid termination in response to such a disclosure with insulation from liability, simply because it failed to wait and see what the employee would decide. For purposes of Title VII analysis, there is no rational distinction between an employee's communication of the fact that she intends to have an abortion, she is considering having an abortion, or she has had an abortion. Logic dictates that discharge on the basis of any of these "statuses" violates the PDA.

4. The lack of reported cases on this topic is not surprising. In contrast to race, gender and pregnancies carried to term, I imagine that it is

This interpretation of the PDA is supported by case law as well. For example, in *International Union, et al. v. Johnson Controls,* 499 U.S. 187 (1991), the Supreme Court held that an employer's refusal to place employees "capable of bearing children" in positions which exposed them to high levels of lead constituted explicit sex discrimination under the PDA. *Id.* at 199. The Court did not require employees to be pregnant before finding violation of the PDA; the employer's classification based on the possibility of pregnancy sufficed. Similarly, an employer's classification based on the possibility of abortion will state a claim. In both scenarios, employers are illegally imposing negative economic consequences on certain reproductive options. As the Supreme Court emphasized in *Johnson Controls,* Title VII lodges control over fertility and reproductive decision-making with potential parents, not employers. *Id.* at 206–07.

### Religious Discrimination

In pertinent part, 42 U.S.C. § 2000e–2 states that it is an unlawful employment practice for any employer to:

(1) ... discharge any individual, or otherwise to discriminate against any individual ... because of such individual's ... religion ..., or

(2) to limit, segregate, or classify his employees ... in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's .. religion....

42 U.S.C. 2000e(j) instructs that:

The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's ... religious observance or practice without undue hardship on the conduct of the employer's business.

The EEOC Guidelines contain the following basic definition of what is meant by a religious practice or belief:

unusual for employers to know when their employees have abortions.

[I]n those cases in which the issue [of whether or not a practice or belief is religious] exist[s], the Commission will define religious practices to include moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views.

29 C.F.R. Part 1605.

Plaintiff does not assert that her consideration of abortion was propelled by any religious belief or practice, or that the order not to discuss abortion at work was in conflict with a tenet of her faith. Therefore, this is not the classic religious "accommodation" case.

Instead, plaintiff argues that she was fired to protect the religious sensibilities of the rest of the staff, and that their religion was impermissibly forced upon her. Plaintiff asserts that, in essence, a religious test was established as a condition of employment with defendant. She contends that because her views on the morality of abortion differed from those of the Christian staff, she was treated differently than they were on the basis of religion. This claim is supported by the fact that, in response to the allegedly disruptive "uproar" over abortion, no staff member but plaintiff was disciplined, and she was fired.

The Sixth Circuit has permitted such "employment atmosphere" claims of religious discrimination to proceed. In *Blalock v. Metals Trades, Inc.,* 775 F.2d 703 (6th Cir.1985), *aff'd on appeal after remand,* 833 F.2d 1011 (6th Cir.1987), *cert. denied,* 490 U.S. 1064 (1989), the plaintiff eagerly accepted employment with an openly "Christian" company, and received permission to "bear witness" to his clients. However, after plaintiff had a falling out with the spiritual leader of the sect he shared with his employer, he was fired. The fact that plaintiff's religious views came to differ from his employer's was a factor in his discharge, and therefore plaintiff stated a viable Title VII claim. *Id.* at 709.

The fact that plaintiff's disagreement on religious issues with her employer[5] is not premised on a faith of her own does not preclude her suit. If the plaintiff in *Blalock* quit the church altogether, the case's result would have been the same. In addition, as the *Blalock* court explained in dicta:

during the initial phase of Blalock's tenure at Metals Trades, other employees who did not share [the employer's] religious views were apparently held to a higher standard of performance. Had one of them been discharged for misconduct of a severity comparable to that engaged in by Blalock, he or she would have had a potential claim of religious discrimination.

775 F.2d at 709, n. 5. *See also, EEOC Decision No. 72–1114,* 4 F.E.P. Cases 842 (1972) (supervisor who discussed his religious convictions on the job violated Title VII's requirement of a working environment free from religious intimidation); *Weiss v. United States,* 595 F.Supp. 1050, 1056 (E.D.Va.1984) (religious harassment, like sexual harassment, usually appears in one of two forms: a hostile environment, or *quid pro quo* ).

### Standard of Proof

 Plaintiff presented a "disparate treatment" claim. 42 U.S.C. 2000e–2(a)(1). In an Opinion denying defendant's motion for summary judgment, I concluded that plaintiff met her initial burden of proof, and established a prima facie disparate treatment case as outlined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).[6] I also concluded

---

5. I am aware that there is no direct evidence that the decisionmakers who fired plaintiff shared the staff's alleged "Christian" beliefs about abortion. However, an employer who acts at its staff's behest can become a conduit for its employees' religious approbation of a fellow employee. In that type of case, although the employer may not share its staff's discriminatory impulses, its choice to act on them remains an illegal employment practice.

6. I will take this opportunity to make explicit what is implicit in the summary judgment Opin-

ion. I reject the formulation of the prima facie case presented in *Doe v. First National Bank of Chicago,* 668 F.Supp. 1110 (N.D.Ill.1987). In response to the distinctions it perceived between abortion and other Title VII claims, the district court in *Doe* embellished *McDonnell Douglas,* and added two requirements to a prima facie case.

One of these additional elements, that the employer knew of the plaintiff's abortion, is reasonable.

The other is not. The *Doe* court required plaintiff to establish at the outset that the persons

that defendant met its burden of production when it presented evidence of poor job performance. This burden was recently redefined, and its satisfaction involves no credibility assessment. *St. Mary's Honor Center v. Hicks*, 509 U.S. ——, 125 L.Ed.2d 407, 417 (1993).

As a result of these legal conclusions, the McDonnell Douglas frame work—with its presumptions and burdens—is no longer relevant.... The defendant's 'production' (whatever its persuasive effect) having been made, the trier of fact proceeds to decide the ultimate question: whether plaintiff has proven 'that the defendant intentionally discriminated against [her because of her consideration of abortion and/or on the basis of religion].

*St. Mary's Honor Center*, 125 L.Ed.2d at 418.

Therefore, at this point the Court's task is to evaluate whether plaintiff has proven, by a preponderance of the evidence, that (a) defendant's offered reasons are pretextual, and (b) defendant was motivated to terminate plaintiff by her consideration of abortion and/or religious difference. *Id.* (clarifying that rejection of employer's asserted reasons does not, in and of itself, mandate a finding for plaintiff); 42 U.S.C. § 2000e–2(m) (an unlawful employment practice is established when plaintiff demonstrates that sex was a motivating factor for any employment practice, even though other factors also motivated the practice).

### *Discussion*

■■■■ I find that the construction of the evidence most generous to defendant is that plaintiff's job performance was one factor in her dismissal. In contrast to the Court's ruling in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), the Civil Rights Act of 1991 instructs that a finding of legitimate factors which actually motivated defendant does not result in a victory for defendant. Instead, plaintiff's damage recovery will be limited if the employer in a mixed motive case proves it would have taken the same action in the absence of the impermissible motivating factor. 42 U.S.C. § 2000e–5(g)(2)(B). In no case will the employer prevail or mitigate damages by offering a legitimate reason for

responsible for her termination possessed animus toward abortions. It opined that:

Unlike race, national origin, color and the usual types of sex discrimination, it is unreasonable and offensive to an awareness of the facts of life to assume, with nothing more, that more likely than not employers easily possess an animus towards abortions....

*Doe*, 668 F.Supp. at 1113. I agree that to "assume, with nothing more" that employers possess an *animus toward abortions is offensive*. To assume the same about employers' attitudes toward employees of color or women would be equally offensive.

However, that is not what the *McDonnell Douglas* prima facie "assumes." A prima facie case "raises an inference of discrimination [] because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Furnco Construction Co. v. Waters*, 438 U.S. 567, 577 (1978) (emphasis added). If the firing of a woman who has had an abortion is "otherwise unexplained," I see no justification for putting the case in a different posture than that reached in cases considering other Title VII classifications.

In addition, the *Doe* court's formulation fails to reach cases in which an employer is not personally prejudiced against a protected group, but acts discriminatorily to satisfy the prejudice of an employee's colleagues or customers.

Finally, the *Doe* court went on to explain that this animus requirement was justified by the "fact" that an employer's view on the morality of abortion:

is like a personal philosophy that is directed for or against the particular aborting woman herself, and not against some group or class or segment of the population with which her conduct causes her to be identified. This is what distinguishes this type of case from other Title VII cases....

*Id.*

The *Doe* court's reliance on this rationale incorrectly substitutes its assessment of what defines a "class" for the judgment of Congress. In enacting the PDA, Congress explicitly overrode the Supreme Court's decision that, for purposes of equal protection analysis, pregnant women are not a "class," and that pregnancy discrimination is not a form of sex discrimination. *E.g., Geduldig v. Aiello*, 417 U.S. 484 (1974). For purposes of Title VII analysis, pregnant women are to be considered a "class," and that class subsumes those women who do not carry their pregnancies to term.

Because the statute at issue is unrelated to Title VII, the Court's recent conclusion that women seeking abortions do not constitute a "class" for purposes of 42 U.S.C. § 1985(3) analysis, *Bray v. Alexandria Clinic*, 122 L.Ed.2d 34 (1993), does not undermine this conclusion.

its decision if that reason did not motivate it at the time of the decision. *Price Waterhouse* at 252–53.

Through documents and testimony, defendant has asserted several lapses in performance, such as failure to follow a call-in procedure and trays left in the halls. However, the testimony of Mr. Herman, the person defendant asserts provided the sole basis for firing, was that the only thing on his mind the morning of October 2 when he decided to fire plaintiff was the coffee issue. Defendant consistently asserts that this is what motivated the termination, and nothing else—not even the fact that one week earlier, Mr. Herman had been apprised of the turmoil that plaintiff was "causing" among the restaurant staff. Therefore, the failure to keep the coffee urns full at all times is the only "poor performance" motivation I will consider.

### Plaintiff's Abortion Discrimination Claim

 I hold that plaintiff has proved by a preponderance of the evidence that but for her consideration of abortion, she would not have been fired. I am not convinced by a preponderance of the evidence that plaintiff's failure to keep the coffee urn full is entirely a pretext for her firing; it may have played a small role. However, I have absolutely no doubt that whatever role the coffee issue may actually have played in her termination, it alone would not have motivated defendant to terminate her on October 2, 1992. I am also convinced that plaintiff would have been fired even if the coffee issue had not arisen. Therefore, defendant is not eligible for mitigated damages under 42 U.S.C. § 2000e–5(g)(2)(B).

### 1. *Plaintiff Was Not Fired For Poor Performance*

#### A. *Testimonial Credibility*

Many things led me to the conclusion that poor job performance was not the primary motivation for defendant's actions, and that defendant would not have terminated plaintiff in the absence of the abortion issue. Foremost among them was the fact that I found the testimony of several of defendant's witnesses to be incredible.

An example of why I reached that conclusion occurred during testimony on who called the meeting at which the management of the Holiday Inn decided Ms. Turic should be fired. In deposition, Ms. Mouw testified that she called general manager Mark Herman to propose plaintiff's termination. At that meeting, Ms. Mouw testified, Mr. Herman informed her for the first time of the problems he had with the coffee that week. Mouw Dep. at 38.

Contrary to Ms. Mouw's deposition testimony, in deposition Mr. Herman provided a different version of events. He testified that he decided that Ms. Turic should be fired for the problems with the coffee, and initiated a meeting with Ms. Mouw.

After he provided that response in deposition, Mr. Herman was told that Ms. Mouw said she had come to him with the recommendation that plaintiff be fired.

Q: ... Are you saying that is not your recollection?

A: I don't remember. If she, if she said she did that, then she probably did it.

Herman Dep. at 29.

At trial, Mr. Herman offered the same version of events he did in deposition—that he called the meeting to discuss firing plaintiff for poor job performance. When asked why he had retracted this description of events at deposition, he candidly responded that he knew his deposition testimony was not true at the time he gave it. Mr. Herman explained that he lied about not remembering in deposition, because he though he would be calling Ms. Mouw a liar if he said he recalled events differently than she did.

Surprisingly, Ms. Mouw's memory of events changed at trial. In deposition she said she called the meeting. At trial she said Mr. Herman initiated the meeting, and stated that her deposition testimony was mistaken. She could not explain why her memory at trial, fifteen months after the event, was better than it had been the date of her deposition, July 22, 1993, ten months after the event, or what had caused her to identify the alleged error in her recollection.

I find these two unbelievable. Their testimony smacked of collusion and revisionist

history, and I do not recall hearing a confession of lying on the stand as open as Mr. Herman's. I simply do not believe that Mr. Herman initiated the meeting where management personnel decided that Kim Turic should be fired solely due to dissatisfaction with her job performance.

## B. *The Reliability of Documentation*

My conclusion that plaintiff was not fired for her failure to keep the coffee urns full at all times also rests on defendant's records— what is there, what is not there, and what defendant's witnesses said about them.

Review of Ms. Turic's personnel file clearly indicates that she was fired in response to the abortion issue. I do not believe Ms. Mouw's testimony that she included the abortion information in the first entry simply because she believes that anything that is talked about at a termination meeting should be documented, regardless of whether it was a ground for termination. For example, she failed to record the issues surrounding the coffee she asserts were the basis of the termination, and were discussed in the meeting. And in the second entry, Ms. Mouw failed to record the fact that plaintiff, herself and Mr. Karas had a second conversation regarding the reasons for plaintiff's termination. Both of these pieces of information would be critical to a complete record of a termination, and according to Ms. Mouw's alleged standard for recording information, they could not have possibly been left out. But they were.

Further along this line, at trial Ms. Mouw asserted that although she wrote the sentence "Termination on the basis of poor job performance and insubordination" in her October 2nd entry, insubordination was not a reason for termination. Ms. Mouw first claimed that she documented "insubordination" simply because plaintiff raised the topic at the meeting. I simply do not believe her. When pressed, Ms. Mouw acknowledged that insubordination with regard to the abortion issue was a reason for plaintiff's termination.

Ultimately, the lengths to which Ms. Mouw went to suggest that her belief that plaintiff violated her September 25 order played no role in the termination decision undermines defendant's position. Ms. Mouw believed the rule to be legitimate, and necessary to the proper functioning of the staff for which she was responsible. She believed plaintiff violated it, but "does not know" why that insubordination did not motivate her, in full or in part, to terminate plaintiff. She wrote the word "insubordination" all over the termination documentation, yet claims that it was simply to "record" a "discussion," and not document a reason. I do not believe her.

For the foregoing reasons, I believe much of what is written in plaintiff's personnel file accurately documents what happened. I do not believe defendant's contention that much which should have been recorded was not.

Defendant's witnesses suggested that plaintiff's personnel file does not contain records of the criticism they allege she received with regard to her job performance because management does not have time to document such mundane matters. The implication of their testimony, which was directed specifically at defendant's numerous "minimum wage employees," is that these employees are constantly making routine mistakes that require oral correction, and that such "discipline" was ongoing, each and every day. Plaintiff's mistakes fell into this category, with the exception of her speaking of her abortion decision. Ms. Mouw testified that the discipline administered in response to that was recorded simply because "it was a serious enough thing to record." By defendant's own standards, the other performance errors were not serious enough things to record. Therefore, defendant essentially contends that plaintiff was fired in response to errors that were not serious enough to record, and were not serious enough to fire other employees for. However, an "error" serious enough to record a week before her termination had absolutely nothing to do with its decision. This is hard to believe.

In the end, Ms. Turic's personnel file speaks loud and clear: there were never any complaints about her job performance worth the trouble to write down. She was worthy of a raise four months before the abortion controversy. She was threatened with termination if she spoke of abortion again, she was believed to have violated that rule, and that played a significant role in defendant's

decision to terminate her. I believe that the second entry regarding plaintiff's termination is sheer fabrication.

## 2. *The Gag Rule*

I have concluded that the reason defendant offers, plaintiff's failure to keep the coffee urns full, is pretextual: it did not actually motivate the termination. The next step is to determine whether plaintiff was the victim of "intentional discrimination;" in other words, whether defendant's true motive for firing her was illegal. *St. Mary's Honor Center*, 125 L.Ed.2d at 418.

As explained above, Mr. Herman knew about the controversy in the kitchen, and he authorized plaintiff's supervisors to discipline her. Ms. Mouw and Ms. Hatley believed that plaintiff had breached the measure they put in place to squelch the controversy, and the controversy continued. Plaintiff has convinced me that part of the reason she was fired was defendant's belief that she violated the gag rule. However, more significantly, defendant viewed plaintiff as the source of trouble, and fired her because it wanted to eliminate the disruption. What remains to be explained is why this behavior constitutes an illegal employment practice.

Defendant's witnesses testified that its employees had been told at staff meetings to "leave personal matters at home." There is nothing wrong with this. Private employers may censor their employees' speech to some degree, and a general rule against discussing non-work related matters "on the clock" may be perfectly reasonable in a business context. However, when the rule is selectively applied and enforced, its motivation and effect must be more closely examined.

First, the "rule" that Kim Turic not discuss her consideration of abortion was the first subject-oriented rule imposed at the Holiday Inn. Never before had an individual employee or the whole staff been forbidden to discuss a particular topic. No man had been asked not to discuss a health concern, no woman had been asked not to discuss a pregnancy. The exception to this statement may be the blanket disapproval of discussing one's personal life at work, but discussions about "personal" topics remained common,

and no employee had ever been reprimanded for violating the general rule against such conversations.

However, the fact that the first occasion for imposing a subject-specific gag rule was in response to an employee's contemplation of exercise of a constitutionally protected right does not make the rule illegal. An employer has a right to put a stop to conversations which are decreasing productivity, and it is undisputed that the staff's discussion of abortion was disruptive. Therefore, if defendant had given each of the 10–15 staff members it knew were participating in the discussion the same warning it gave plaintiff—"if you discuss Kim Turic's abortion decision, or abortion generally, you run the risk of termination"—I would be convinced that the source of the rule was not hostility toward plaintiff and her consideration of abortion, but a concern for the work environment.

But that is not what happened. Of the 10–15 people discussing the issue, Kim Turic was identified as the problem, singled out, and was the only one gagged. A person considering abortion and people who were not considering it engaged in the same improper conduct, and only the person considering abortion was censured.

For example, Lecia Hatley had direct knowledge that two other waitresses (Celia Kleinhexel and Linda Adams) were discussing the issue, yet they were not asked to stop. They were not disciplined, nor were they terminated. Ms. Hatley testified that she doesn't know why she did not ask the other waitresses to stop participating in the "uproar," but the fact that she may have perceived the decision to single plaintiff out as benign does not make it so. "[T]he absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect." *Johnson Controls*, 499 U.S. at 199. Indeed, perhaps this simply illustrates how deeply our unquestioned prejudices can run.

There was no evidence that plaintiff talked about her abortion decision more than any other staff member, and my impression is that she did so much less than the others.

Similarly, I saw little evidence that she violated the gag rule.

The selection of one person out of 10–15 who are participating in a conversation is evidence that plaintiff was perceived as disruptive not because of what she said, but because of who she was—a woman considering terminating a pregnancy. As Karen Mouw said in her summary of the September 25 meeting, plaintiff was disciplined for "making an uproar of the staff." In other words, plaintiff was held accountable, and was penalized, for her colleagues' reaction to her and her choice. In the context of race or religion, the illegality of this should be obvious—an African–American or Muslim employee could not be held responsible for "causing" turmoil which flows from his or her presence. The same is true of a woman considering abortion.

Ultimately, I conclude that plaintiff was not fired because she was the source of gossip (the words, or the conversation itself), but because she was the source of controversy. Her supervisors and colleagues were not just reacting to her words [7], they were reacting to her status. Whether it shared its employees' prejudices or not, defendant acted on them to eliminate the person who did not fit in, the person whose mere presence upset her colleagues. Plaintiff was not fired simply because defendant believed she had disobeyed a rule which was discriminatorily applied and enforced. She was fired because, a week after the warning, the "turmoil" had not abated, at least in the view of one supervisor (Mouw).

The combination of defendant's witnesses incredibility, their selective application of a gag rule upon threat of termination, and their scramble for justification for plaintiff's termination have convinced me that but for her consideration of abortion, she would not have been fired. Defendant's gag rule was in no way "neutral," and is evidence of what I conclude was defendant's ultimate motive: ridding its workplace of an "undesirable" element.

Title VII identifies a limited set of circumstances in which employers do not have the option of simply removing the "undesirable" or controversial person from the workplace. Instead, the burden is on the other employees and customers, to become accustomed to being alongside people with radically different beliefs, backgrounds and experiences in the public sphere. Because it is a "medical aspect of pregnancy," the PDA forbids employers from treating an employee differently on the basis of her consideration or use of abortion. I hold that but for her consideration of abortion, plaintiff would not have been fired. Therefore, in the words of *St. Mary's Honor Center*, 125 L.Ed.2d at 416, plaintiff has proven that she was the victim of "intentional discrimination," as defined by the PDA.

### Plaintiff's Religious Discrimination Claim

■ Although it survived a summary judgment motion, plaintiff virtually ignored this claim in her presentation of proof at trial. Plaintiff has presented only two facts that support her religious discrimination claim. The first is that two of the waitresses, Linda Adams and Celia Kleinhexel, were upset by plaintiff's consideration of abortion, and the topic's discussion, because it was contrary to their religious views. The second is Mike Karas' testimony that the staff members' negative reaction to plaintiff's consideration of abortion was rooted in their religious feelings.

The connection between religious views and views on abortion is a complicated one. While feelings about abortion can be linked to religious doctrine, plaintiff has made no effort to demonstrate that they were so linked in this case. I am not convinced, by a preponderance of the evidence, that defendant held plaintiff to a different disciplinary standard than other employees because she was not Christian, and all the other staff members were.

Therefore, I hold that plaintiff did not carry her burden and prove that defendant committed "employment atmosphere" reli-

**7.** *E.g., Maguire v. Marquette University,* 814 F.2d 1213 (7th Cir.1987) (Catholic college's refusal to hire female theology professor due to her views

on abortion did not constitute sex discrimination).

gious discrimination, as described in *Blalock, supra.*

### Pendent State Claims

Plaintiff has plead violation of Michigan's Elliott–Larsen Civil Rights Act, M.C.L. 37.-2101 *et seq.* Plaintiff's complaint also includes an ambiguous claim to informational privacy, and an improper interference with contract claim.

The Elliott–Larsen Act provides no more protection than Title VII and the PDA. Therefore, no further discussion of this claim is warranted.

Plaintiff failed to offer any proof or legal argument in support of her state contract and privacy claims, so they will be dismissed.

### *Damages*

As originally drafted, Title VII allows prevailing parties to recover back pay and attorney's fees. 42 U.S.C. § 2000e–5(g) authorizes an award of back pay, or any other equitable relief the Court deems appropriate. Any back pay award is to be reduced by interim earnings or amounts plaintiff could have earned with reasonable diligence. 42 U.S.C. § 2000(e)–5(k) gives the Court discretion to allow the prevailing party a reasonable attorney's fee as part of the costs.

The Civil Rights Act of 1991 added a new provision to Title VII, which permits victims of intentional discrimination to recover compensatory and punitive damages. 42 U.S.C. § 1981(a)(1). Plaintiff may recover punitive damages if defendant engaged in a discriminatory practice with malice or with reckless indifference to the federally protected rights of an aggrieved individual. 42 U.S.C. § 1981(b)(1). Plaintiff may recover compensatory damages for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses. 42 U.S.C. § 1981(b)(3).

 The Act caps the new category of compensatory and punitive awards at $100,-000 for employers like defendant, who have

under 200 employees. 42 U.S.C. § 1981(b)(3)(B). However, that cap extends to only compensatory and punitive damage awards, and does not include back pay or other relief authorized by § 2000e–5(g).

I hold that plaintiff shall recover damages in the following amounts:

*Back Pay:* $9,400

 According to defendant's records, plaintiff earned approximately $680 a month in wages and tips during the nine months she worked at the Holiday Inn in 1992 ($6,100 total).[8]

I find that plaintiff reasonably mitigated the back pay damages. She sought employment at factories and restaurants, but reported that few places wanted to hire a pregnant woman. She worked for a restaurant cleaning service, and found some temp work. Plaintiff was employed on the 11:00 p.m. to 7:00 a.m. shift at Denny's for a few weeks after her second child was born, but had to quit because she could not find child care during those hours. In 1993, plaintiff earned $800.

Sixteen and one-half months passed between the date plaintiff was fired and the date of her trial. However, she had her second child during that period. She waited six weeks after having the child to return to the workforce, and consequently six weeks are properly subtracted from the relevant time period. Therefore, I find that plaintiff is entitled to recover 15 months of back pay, at $680 per month, reduced by the $800 she earned in 1993. This calculation produces an award of $9,400.

*Compensatory Damages:* $50,000

 As explained above, I find that defendant "intentionally" discriminated against plaintiff, and she is therefore eligible for an award of compensatory damages. Such an award is appropriate in this case. Plaintiff suffered significant and unusual emotional pain, suffering, and mental anguish in response to defendant's actions.

Ms. Turic is a person who has seen some of the worst life has to offer. She left school

---

**8.** Plaintiff testified that she earned approximately $10,000 over the course of the nine months she worked at the Holiday Inn in 1992, but produced no documentation. Therefore, I must use the more conservative figure in the back pay calculation.

when she was fifteen. The summer after the ninth grade, she learned she was pregnant with her first child. She was forced to spend eight months in a shelter for the homeless, and then she and her baby moved in with her mother.

There is nothing shameful about receiving government aid, but plaintiff's strong work ethic and desire for independence led her to reject welfare, and work long hours at low-paying menial jobs in order to create a better life for herself and her child. Even with her jobs, plaintiff had difficulty feeding and clothing herself and her child.

Plaintiff loved her job at Holiday Inn, because it got her out in the world. Her job gave her a social life she did not have outside of her family, and it gave her economic and personal independence from her abusive boyfriend. Plaintiff felt challenged at work, and she enjoyed feeling busy and interacting with the staff and customers.

On her nineteenth birthday, plaintiff learned that she was pregnant again. The ordinarily stressful decision about whether to continue an unplanned pregnancy was complicated in plaintiff's case by the economic tight rope she was walking, and the abusive boyfriend who fathered both children. At this point of crisis in her life, she was fired from the job which provided her primary source of income. The suffering caused by this termination was exaggerated not by the fact plaintiff was undergoing a personal crisis at the time, but because the very reason plaintiff was fired was that she was confronting a decision about an unplanned pregnancy.

In an effort to make plaintiff "whole," as authorized by the Civil Rights Act of 1991, plaintiff is awarded $50,000 in compensatory damages.

*Punitive Damages:* $30,000

■ I find that defendant engaged in a discriminatory practice with reckless indifference to plaintiff's federally protected rights, and that she is entitled to punitive damages for this behavior.

I do not find that defendant was necessarily motivated by malice. However, the way in which defendant responded to complaints from its employees was recklessly indifferent

to plaintiff's right to not suffer an adverse employment action on the basis of a medical aspect of pregnancy. Defendant moved swiftly to remove a "troublemaker," without regard to the fact that the source of the "trouble" was a federally protected status. It made absolutely no effort to explore alternatives to such action; instead, plaintiff was quickly fired.

I do not minimize the significance and detriment of an "uproar," and in most cases at-will employment allows employers to eliminate the person at the center of such a controversy. However, when the basis of the controversy is a characteristic such as race, gender, religion, or an aspect of pregnancy, this is not a permissible response. This Court is obligated to send a strong signal that the "odd person out" cannot be defined as the problem. The problem is other employees' intolerance and inability to work alongside persons with different backgrounds and beliefs as themselves. Though I respect that "pro-life" or "anti-choice" beliefs may be deeply held, employers cannot allow them to be manifested in discriminatory action against a colleague who holds, or acts on, a different set of beliefs.

In addition, I find that an award of punitive damages is proper in response to defendant's duplicity in plaintiff's firing and in the course of litigation. I think the second termination summary and references to the call-in procedure violation constitute manufactured documents. In addition, I think defendant's witnesses were actively attempting to deceive the Court.

Therefore, plaintiff is awarded $30,000 in punitive damages.

*Attorney's Fees:* A reasonable fee, not to exceed $20,000.

I conclude that it is appropriate in this case to exercise my discretion to award plaintiff a reasonable attorney's fee as damages. Plaintiff shall forward a bill to defendant for a reasonable sum, which in no case shall exceed $20,000. If defendant wishes to challenge the reasonableness of the bill, it may submit the bill and the basis for its dispute to this Court in a separate motion.

### Conclusion

In the case of pregnancy and abortion, Congress has chosen to insure that private employers cannot burden or penalize a woman's exercise of her constitutional right to control her reproductive destiny. Because I find this is what defendant has done, plaintiff prevails on her pregnancy discrimination claim.

### JUDGMENT

In accordance with the Opinion entered this date;

**IT IS HEREBY ORDERED** that judgment shall be entered in favor of **PLAIN-TIFF.**

**IT IS FURTHER ORDERED** that plaintiff is awarded damages in the amount of $89,400.00, plus a reasonable attorney's fee.