**Penelope Jane DENARDO, Plaintiff,**

v.

**CLARENCE HOUSE IMPORTS, LTD., Defendant.**

**No. 93 C 5639.**

United States District Court, N.D. Illinois, Eastern Division.

Nov. 21, 1994.

Herbert H. Victor, Karen Lynn Warshawsky, Herbert H. Victor, Chicago, IL, for plaintiff.

Robert Eliot Shapiro, Elyse Maria Tish, Barack, Ferrazzano, Kirschbaum & Perlman, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

ANN CLAIRE WILLIAMS, District Judge.

Plaintiff, Penelope Jane DeNardo ("DeNardo"), has brought this suit against her former employer Clarence House Imports, Ltd. ("Clarence House"). DeNardo alleges that Clarence House discharged her because she was pregnant, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended by The Pregnancy Discrimination Act of 1978.[1] Defendant has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons stated below, defendant's motion is denied in part and granted in part.

### Background

Defendant Clarence House, a New York wholesaler, sells home furnishings, fabric, and wallpaper to interior designers and hotels. Clarence House operates a company-owned showroom at the Merchandise Mart in Chicago. (Raup Dep. p. 7–8). Robin Roberts ("Roberts") is the sole shareholder of Clarence House and the chairman of its Board of Directors. He is the only person at Clarence House with the authority to make personnel decisions. (Roberts Aff. ¶¶ 1, 3). John Raup ("Raup") is Clarence House's national sales manager. Raup's responsibilities include supervising the operations at the Chicago showroom. Barbara Wike ("Wike") is the on-site manager for the showroom. (Raup's Aff. p. 7–12).

1. 42 U.S.C. § 2000e–2(a) provides in pertinent part: "It shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual ... because of such individual's race, color, religion, sex, or national origin." Section 2000e(k) specifies that: "the terms 'because of sex' or 'on the basis of sex' include, but are not limited to, 'because of' or 'on the basis of' pregnancy, childbirth, or related medical conditions...."

In September, 1991, Roberts decided that Clarence House needed to hire a receptionist for the Chicago showroom. (Raup Aff. ¶ 4). Wike then conducted an initial interview with the plaintiff for the position. At the interview, Wike allegedly asked DeNardo if she had plans to start a family. DeNardo stated that she did not. (DeNardo Dep. at 10).[2] DeNardo was then called back for a second interview with Wike and Raup and she was hired approximately one week later. (Wike Aff. ¶ 5).

On December 28, 1991, DeNardo learned that she was pregnant. (DeNardo's Answers to Interrogatories, # 2). On December 30th, DeNardo called Clarence House's comptroller in New York, Harold Spector, to request insurance claim forms. (DeNardo Dep. at 28). When Spector asked DeNardo why she needed the forms, DeNardo informed him that she was pregnant. The next day, December 31, 1991, Raup called the Chicago showroom from his office in New York and told Wike that the receptionist position was to be eliminated and that she was to fire DeNardo. (Raup Dep. at 27–28). After speaking with Raup, Wike told DeNardo that she was fired "due to the recession." According to DeNardo, Wike then said to her "I hear [you're] pregnant, congratulations when is the baby due." (DeNardo Dep. at 30–31).

Defendant asserts that the decision to fire DeNardo was made well in advance of December 31, 1991. Roberts claims that sales in Chicago had declined in November. Because Clarence House could no longer afford to pay a receptionist, he decided at that time to eliminate the position. He then notified Raup of his decision. Together they decided to wait until after Christmas to fire DeNardo, "as a gesture of Christmas spirit." (Raup Dep. at 20–23, Roberts Aff. ¶¶ 5–9).

Less than two months after firing DeNardo, Clarence House hired Christopher Peregoy ("Peregoy"). Clarence House asserts that Peregoy was hired as an assistant in the showroom, and that his principal responsibility was to do stock work. (Raup's Dep. p. 39). Peregoy himself, however, claims that he was hired as a receptionist and that his daily duties consisted primarily of sitting at the front desk and answering the phones, only occasionally loading or unloading stock. (Peregoy's Aff. ¶ 8). Peregoy's annual salary was $18,200, while DeNardo's annual salary had been $16,900. (Plaintiff's Ex. G, Employee Profiles).

On March 20, 1992, DeNardo filed a charge of pregnancy discrimination with the Equal Employment Opportunity Commission ("EEOC"). On June 30, 1993, the EEOC dismissed DeNardo's claim and issued a right to sue letter. (Def. Ex. G). DeNardo subsequently brought this action. Clarence House has moved for summary judgment on two grounds. First, Clarence House asserts that DeNardo has failed to produce sufficient evidence to sustain her substantive claim of gender discrimination under Title VII of the Civil Rights Act of 1964. Second, Clarence House asks the court to decide as a matter of law that because they had less than 100 employees at all relevant times, punitive damages should be capped at $50,000 pursuant to 42 U.S.C. § 1981a(b)(3)(A).

### Summary Judgment Standard

■ Summary judgment is appropriate only when the evidence presented raises no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Scherer v. Rockwell Int'l. Corp.*, 975 F.2d 356, 360 (7th Cir. 1992). "In order for an issue to be 'genuine,' the evidence must be such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 360 (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). When considering a motion for summary judgment, the court must view the evidence, as well as all reasonable inferences to be drawn from it, in the light most favorable to the nonmoving party. *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1038 (7th Cir.1993) The summary judgment standard "is applied with added

---

2. In a June 1993 affidavit, Wike denies ever asking DeNardo about whether she was planning to have a family. (Wike Aff. ¶ 6). According to Wike, she merely asked DeNardo whether there was anything that would prevent her from making a long-term commitment to the company. (*Id.*).

rigor in employment discrimination cases, where intent and credibility are crucial issues." *Id.* at 1038.

## *Discussion*

### *Gender Discrimination*

 To succeed on a claim of discrimination under Title VII of the Civil Rights Act, a plaintiff may either provide direct evidence of discrimination or, more commonly, show discrimination through the indirect, burden-shifting method of proof established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under the *McDonnell Douglas* framework a plaintiff must first state a prima facie case of discrimination. *Id.* at 802, 93 S.Ct. at 1824. For a gender discrimination claim the plaintiff must show: (1) she was a member of the protected class, (2) she was doing her job well enough to meet her employer's legitimate expectations, (3) she was discharged or demoted, and (4) the employer sought a replacement for her. *See Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1122 (7th Cir.1994); *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824.

 Once the plaintiff has established a prima facie case, the burden shifts to the employer to rebut the presumption of discrimination by articulating a legitimate, nondiscriminatory reason for the termination. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. If the employer makes this showing, the plaintiff, as the party with the ultimate burden of persuasion, must then demonstrate by a preponderance of the evidence that the employer's stated reasons were a mere pretext for discrimination. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). Of course, on a motion for summary judgment the plaintiff carries a lesser burden. "[She] must only 'produce evidence from which a rational factfinder could infer that the company lied' about its proffered reasons." *Anderson*, 13 F.3d at 1124 (*quoting Shager v. Upjohn Co.*, 913 F.2d 398, 401 (7th Cir.1990)). As the *Shager* court explained, "[i]f the only reason an employer offers for firing an employee is a lie, the inference that the real reason was a forbidden one, such as [gender] may naturally be drawn." *Shager*, 913 F.2d at 401.

Clarence House first argues that DeNardo failed to produce sufficient evidence to constitute a prima facie case of discrimination. The defendant does not dispute that DeNardo has satisfied the second and third elements of the prima facie case, that she was performing her job satisfactorily and was nonetheless terminated. However, the defendant claims that she has failed to establish the first and fourth elements. Clarence House argues that because neither Roberts nor anyone else involved in the termination decision was aware of DeNardo's pregnancy at the time they made the decision to fire her, DeNardo has failed to establish that she was a member of the protected class. Clarence House further claims that it did not hire anyone to replace DeNardo. Finally, the defendant asserts that even if DeNardo had set forth a valid prima facie case, Clarence House has produced undisputed evidence of a legitimate, nondiscriminatory reason for DeNardo's discharge.

 The court first addresses the issue of whether or not DeNardo was a member of the protected class. This question is trickier than it appears. Unlike other protected classes such as race, gender or national origin, pregnancy, especially in its early stages, is not always readily discernible. It is therefore possible for an individual to qualify as a member of the protected class, as a pregnant woman, even though her employer has no actual knowledge that she is pregnant. In these cases, it hardly seems fair or even rational to infer discrimination based on the burden shifting formula laid out in *McDonnell Douglas*. The rationale behind the *McDonnell Douglas* presumption is that when an employer takes action against a member of a protected class without a legitimate nondiscriminatory reason for doing so, it is reasonable to presume that such action was motivated by impermissible factors. *See Burdine*, 450 U.S. at 255, 101 S.Ct. at 1094. However, if the employer does not know that an individual is a member of a protected class, such a presumption ceases to be rational.

In an analogous context, the court in *Doe v. First Nat'l. Bank,* 668 F.Supp. 1110 (N.D.Ill.1987) concluded that the unique nature of a discrimination claim based on having an abortion necessitated a revision of the prima facie case set forth in *McDonnell Douglas.* In *First Nat'l,* the court added two additional requirements to the traditional elements of the prima facie case: (1) that the employer knew the plaintiff had an abortion, and (2) that the employer possessed animus towards abortion. *Doe,* 668 F.Supp. at 1113. While the latter element is not relevant to the case at hand, the requirement that an employer knew of the plaintiff's status as a member of the protected class is appropriate in this instance as well.[3] The court therefore finds that in order to show gender discrimination based on pregnancy, a plaintiff must initially show the employer knew she was pregnant and consequently, a member of the protected class.

Defendant argues that Roberts made the decision to fire DeNardo in November, and as he did not know she was pregnant at that time, his decision could not have been motivated by discrimination. If the decision to fire DeNardo was in fact made in November, defendant would be right. The key issue therefore becomes whether DeNardo has produced sufficient evidence to raise a genuine issue of fact as to whether or not Clarence House decided to terminate her in November, before they learned she was pregnant. The court believes that she has.

Both parties agree that *Suarez v. Illinois Valley Community College,* 688 F.Supp. 376 (N.D.Ill.1988) is instructive. In *Suarez,* the court also addressed the issue of whether or not the defendants had decided to discharge the plaintiff before they knew she was pregnant. In that case, one of the defendants testified that they had agreed to fire the plaintiff at a meeting in December, the month before she was actually discharged. The court noted however, that the testimony of these. individuals was "vague and some-times conflicting" with respect to when, where, and if, this meeting actually took place. *Id.* at 381. Relying in part on the conflicts in defendants' testimony, the court denied defendants' motion for summary judgment.

In this case, the testimony of the defendant that Roberts decided to eliminate the receptionist position in November, is not similarly in conflict. Both Roberts and Raup testified to this in their affidavits and depositions. However, DeNardo has come forward with sufficient evidence of other conflicts in Clarence House employees' accounts of the key events to raise credibility issues similar to those noted by the court in *Suarez.* By everyone's account, Harold Spector, the comptroller, was the only Clarence House employee DeNardo told she was pregnant. As noted previously, DeNardo told Spector about her pregnancy when she called for insurance forms on December 30, 1991. However, DeNardo alleges that after Wike spoke to Raup on the 31st, Wike not only told DeNardo that she was fired, but also wished her congratulations on being pregnant. Construing the record in the light most favorable to DeNardo, these facts could lead a rational factfinder to conclude that Spector had told Raup and Roberts that DeNardo was pregnant some time on December 30, 1991—one day before she was fired.

While Wike, Raup, and Roberts all deny DeNardo's claim about when they learned of her pregnancy, their stories conflict. Wike claims she learned DeNardo was pregnant from Raup a couple weeks after DeNardo was discharged. (Wike's Aff. ¶ 10). Raup, on the other hand, states that Wike told him DeNardo was pregnant a month later. (Raup's Dep. p. 54). Roberts claims he did not know DeNardo was pregnant until January 1992. (Robert's Aff. ¶ 10). As an entity, Clarence House initially asserted, in its statement to the EEOC, that DeNardo told Wike she was pregnant the day Wike fired her.

---

**3.** This issue was addressed in one other reported case, *Turic v. Holland Hospitality,* 849 F.Supp. 544 (W.D.Mich 1994), also a discrimination claim based on abortion. The *Turic* court rejected the animus element imposed in *First Nat'l* as contrary to the *McDonnell Douglas* framework. However, the court accepted as reasonable the requirement that an employee must show that her employer knew she had an abortion as part of her prima facie case of discrimination under Title VII. *Id.* 849 F.Supp. at 551 n. 6.

(Respondent's Position Statement p. 2, Plaintiff's Ex. E). In Clarence House's memorandum in support of its motion for summary judgment, defendant later suggests that Clarence House personnel did not learn DeNardo was pregnant until they received notice of her claim from the EEOC. Although these conflicting stories do not directly concern whether the decision to fire DeNardo was made in November, when coupled with the absence of any written evidence documenting Clarence House's purported November 1991 termination decision, they raise a substantial credibility issue with respect to defendant's account of the relevant events. This type of credibility issue is properly resolved by the factfinder.

To establish a prima facie case of discrimination, plaintiff must also show that Clarence House sought a replacement for her. Again, genuine issues of material fact preclude the court from deciding this issue on a motion for summary judgment. Clarence House claims that Peregoy, who was hired two months after DeNardo was fired, was not hired to replace DeNardo but rather, as an assistant in the showroom. In Raup's deposition he states that Peregoy was hired with the understanding that his principal responsibility was going to be doing stock work. Moreover, Roberts asserts in his affidavit that he authorized the hiring of Peregoy "to perform stock work, such as hanging displays and organizing and maintaining samples...." (Robert's Aff. ¶ 12). On the other hand, Peregoy is quite clear in his testimony that he was hired to act as a receptionist. First, Peregoy states that he approached Raup and Wike concerning a possible position, "because it looked like they needed somebody to answer the phones." (Peregoy Dep. p. 7). Furthermore, when asked to describe his job responsibilities, Peregoy stated: "[p]rimarily I answered the phone, made coffee, took orders, sold fabric, greeted customers, operated the postage machine, just basic data entry, phone correspondence." (Id. p. 24). Resolving the dispute between the parties concerning whether Peregoy was hired to replace DeNardo must be left to the factfinder, as it will require a weighing of the credibility of the witnesses.

Finally, the court turns to the legitimacy of Clarence House's proffered reason for DeNardo's discharge. To support its position that DeNardo's discharge was motivated by a legitimate business concern, Clarence House states that the decision to eliminate the receptionist position was taken because sales in Chicago had declined. They were reportedly no longer able to afford to pay for a receptionist. However, shortly after firing DeNardo, Clarence House hired Peregoy, at a salary greater than DeNardo's. Though the parties disagree about the nature of Peregoy's duties, a rational factfinder could find that Peregoy was hired to perform DeNardo's old job duties. If true, Clarence House's decision to hire Peregoy would be clearly inconsistent with Clarence House's assertion that DeNardo was discharged because they could not afford to pay her salary. The court finds that this evidence raises an issue as to whether defendant's proffered nondiscriminatory reason for terminating DeNardo was valid, or mere pretext. DeNardo has therefore met her burden under the *McDonnell Douglas* framework of showing that the defendant's stated reason for discharging her may not have been legitimate.

### Cap on Damages

42 U.S.C. § 1981a(b)(3)(A) states:

The sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed, for each complaining party—

(A) in the case of a respondent who has more than 14 and fewer than 101 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $50,000;

Defendant has submitted evidence indicating that at no point during 1991, 1992 or 1993 did Clarence House employ more than 100 employees in any given week. In the exhibits attached to defendant's 12(m) statement the defendant provided copies of documents entitled "Clarence House Imports Payroll Summary" for each of the three years in question. Those documents list the

name of each employee, the date on which they were hired and the date on which their employment was terminated, if applicable. This evidence shows that during those three years Clarence House did not employ more than 100 employees in any given week. Defendant has therefore moved for a finding that punitive damages may not exceed $50,000 pursuant to § 1981a(b)(3)(A).

Plaintiff argues that this evidence was not properly authenticated, and therefore should be found inadmissible for summary judgment purposes. Defendant has since submitted an affidavit from its comptroller, Harold Spector, regarding the employee payroll reports relied on by the defendant. Spector testifies that these reports were compiled by him in connection with Clarence House's pension plan, and are compiled regularly each year. The court is satisfied that this affidavit meets the requirements of Rule 901 of the Federal Rules of Evidence and Rule 56(e) of the Federal Rules of Civil Procedure.[4] *Accord Sing v. Veterans Admin.*, 1989 U.S.Dist. LEXIS 11999 (N.D.Ill. Oct. 4, 1989) (allowing defendants to submit affidavits authenticating previously submitted evidence in reply).

 Plaintiff additionally claims that summary judgment should be denied on this issue because the evidence shows that Clarence House employed more than 101 employees in each of the three relevant years. While it is true that Clarence House seems to have employed a total of more than 100 employees during 1991 and 1993, that is not the relevant inquiry under the statute. Rather, the statute expressly applies to those employers who employed "more than 14 and fewer than 101 employees in each of 20 or more calendar weeks...." Defendant's evidence establishes that Clarence House employed less than 101 employees in each week of the relevant period. As the plaintiff has submitted no evidence challenging the veracity of this evidence, summary judgment is granted on this issue.

4. Rule 901 of the Federal Rules of Evidence provides that authentication is satisfied "by evidence sufficient to support a finding that the matter in question is what its proponent claims." Rule 56(e) of the Rules of Civil Procedure states:

### Conclusion

For the foregoing reasons, defendant's motion for summary judgment is denied with respect to DeNardo's substantive claim of discrimination under Title VII of the Civil Rights Act of 1964, and granted as to the cap on punitive damages. A pretrial conference in chambers will be scheduled with the entry of this order. Parties should fully explore settlement well in advance of this conference.

"Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."